UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JEFFREY KRUG, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION - LAW |
| | : | |
| - against - | : | |
| | : | JURY TRIAL DEMANDED |
| BLOOMSBURG UNIVERSITY, | : | |
| PENNSYLVANIA STATE SYSTEM | : | |
| OF HIGHER EDUCATION, | : | |
| BASHAR HANNA and | : | |
| JAMES KRAUSE, | : | |
| | : | No. |
| Defendants. | : | |

<u>COMPLAINT</u>

Plaintiff Jeffrey Krug ("Dr. Krug"), by his attorneys, Barry H. Dyller,

Esq. and Patrick T. O'Connell, Esq., for his Complaint, alleges as follows:

<u>JURISDICTION AND VENUE</u>

1.    This action arises out of violations of Title IX,[1] 20 U.S.C. §

1681(a), *et seq.*, 42 U.S.C. § 1983, and the common law.   After

administrative remedies have been exhausted, Dr. Krug will also assert

---

[1] Title IX is the federal statutory scheme which prohibits discrimination or harassment based on sex in educational institutions.   Title IX also prohibits retaliation based on making a sexual harassment or discrimination complaint or assisting someone else to make such a complaint.

claims of defendants' violations of Title VII, 42 U.S.C. § 2000e, *et seq.*, and the Pennsylvania Human Relations Act, 43 Pa.C.S. § 951, *et seq.*

2.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343 and 1367.   Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because defendants reside in this State and this judicial district, and because a substantial part of the events or omissions giving rise to this claim occurred in this judicial district.

THE PARTIES

3.     At all times relevant hereto, plaintiff Jeffrey Krug was a resident of Pennsylvania.

4.     Defendant, Bloomsburg University ("Bloomsburg" or "the University"), is an institute of higher education under the control and operation of the Commonwealth of Pennsylvania by virtue of its membership in the Pennsylvania State System of Higher Education ("PASSHE").   Bloomsburg University has a principal address of 400 East Second Street, Bloomsburg, Columbia County, Pennsylvania 17815.

5.     Upon information and belief, Bloomsburg University and PASSHE are recipients of funds from the United States government.

6.    Defendant PASSHE runs fourteen of Pennsylvania's state universities.   PASSHE has a principal address of 2986 N. 2nd Street, Harrisburg, PA 17110-4000.

7.    At all times relevant hereto, defendant Bashar Hanna was the president of Bloomsburg University.

8.    At all times relevant hereto, defendant James Krause was the Interim Provost and Senior Vice President for Academic Affairs for Bloomsburg University.

## FACTUAL BACKGROUND

Dr. Krug

9.    On June 1, 2015, Dr. Krug was appointed as the Dean of the College of Business at Bloomsburg University.

10.    Dr. Krug quickly established himself as an innovator and accomplished relationship builder and fundraiser, which elevated the stature of the College of Business during his tenure.

11.    In February 2016, Dr. Krug secured a gift to the University's business school which at the time was the largest single donor gift to Bloomsburg University.

3

12.    In August 2016, Dr. Krug secured a major gift from Terry and JoAnn Zeigler to name the Zeigler College of Business.   The gift was the largest donation in PASSHE's history.

13.    In addition to fundraising, Dr. Krug accomplished much in a short time as Dean.   He launched new MBA and certificate programs in downtown Philadelphia, rebranded the MBA program on Bloomsburg University's main campus, signed an exclusive agreement with the Pennsylvania National Guard, launched a financial literacy initiative for K-12 students, established a new Global Business Institute and Entrepreneurship Leadership Center to support new initiatives, and introduced new academic programs in supply chain management, international business, personal financial planning and professional sales.

14.    Because of Dr. Krug's performance and qualifications, on September 14, 2016, Bloomsburg University's president David Soltz granted Dr. Krug tenure on the faculty at Bloomsburg University.

15.    On March 13, 2017, President Soltz reappointed Dr. Krug as Dean of the Zeigler College of Business for the 2017-2018 academic year.

4

Defendant Dr. Bashar Hanna

16.    In the fall of 2016, President Soltz announced that he would be retiring.   President Soltz formally retired as of June 30, 2017.

17.    In November 2016, Bloomsburg University announced a Presidential Search Committee, which subsequently conducted a search for a new president.

18.    Dr. Bashar Hanna applied for the University's presidency.

19.    During the pendency of Dr. Hanna's application process, faculty members at Dr. Hanna's prior employer, Delaware Valley University, sent an email to faculty and staff at Bloomsburg University.   A copy of the Delaware Valley University email is attached hereto as Exhibit 1.

20.    In that email, it was noted that in his prior employment as Vice President for Academic Affairs and Dean of the Faculty at Delaware Valley University, Dr. Hanna was "prejudiced and confrontational to faculty and staff, but particularly toward female faculty and focused on females that held Administrative roles."

21.    It was also noted that Dr. Hanna "routinely talk[ed] negatively about women and joke[d] about the varying lifestyles they may have chosen."

22.    The email stated that Dr. Hanna was "required to take an Anger Management course while at DVU [Delaware Valley University] after inflicting severe and long-lasting mental damage to several that he interacted with."   It was stated that "[w]hile at Temple University he was also officially reprimanded for similar behavior."

23.    The email continued by explaining violent and unprofessional behavior, and retribution against people who don't agree with or support his positions.

24.    The email also discussed Dr. Hanna's problems at other universities at which he had been employed.   Those problems included "confrontational behavior" that led Kutztown University of Pennsylvania to buy out Dr. Hanna's remaining contract and ask him to resign.

25.    In spite of all these problems, and the fact that Kutztown University of Pennsylvania is also a PASSHE university, Bloomsburg University hired Dr. Hanna as its president, effective July 1, 2017.

_____

<u>JANE DOE NO. 1 and JANE DOE NO. 2</u>[2]

26.    During the relevant time period preceding November 8, 2017 and March 21, 2018, JANE DOE NO. 2 was Dr. Krug's administrative assistant.   During the relevant time period, JANE DOE NO. 1 was President Hanna's administrative assistant.

27.    On November 8, 2017, JANE DOE NO. 1 confided to JANE DOE NO. 2 that President Hanna had subjected her to sexual harassment and advances.   After she rebuffed his advances, President Hanna had retaliated against her and JANE DOE NO. 1 feared for her job.

28.    On November 9, 2017 JANE DOE NO. 2 asked Dr. Krug if she and JANE DOE NO. 1 could meet with him to discuss President Hanna's sexual harassment and other issues JANE DOE NO. 1 had uncovered while serving as President Hanna's assistant.

29.    At the time JANE DOE NO. 2 first spoke with Dr. Krug, there was no sexual harassment or "Title IX" complaint made and no process had been initiated.

---

[2] We refer to these persons as Jane Doe No. 1 and Jane Doe No. 2 to afford them a modicum of privacy.   Defendants are aware of their identities.

30.    Because he had not previously dealt with any sexual
harassment issue, Dr. Krug spoke, in general terms, to his father, and to
his sister, who is chief of staff to the president of another university and has
significant knowledge of and experience with sexual harassment matters.

31.    After reviewing the University's sexual harassment policy with
his sister, Dr. Krug realized that he was required to report the sexual
harassment to the University's Title IX coordinator.    Further, failure to
report President Hanna's sexual harassment could result in legitimate
termination under the policy.

32.    The next day, JANE DOE NO. 1 and JANE DOE NO. 2 met
with Dr. Krug.    JANE DOE NO. 1 detailed President Hanna's sexual
harassment toward her, including putting his arms around her and kissing
her.    JANE DOE NO. 1 explained that when she rebuffed his sexual
advances, President Hanna immediately retaliated against her, including
open hostility toward her, blocking her access to his email and speaking in
a derogatory and demeaning manner toward her.

33.    JANE DOE NO. 1 also told Dr. Krug about financial
improprieties of which President Hanna was engaging.

8

34.    JANE DOE NO. 1 also told Dr. Krug about President Hanna's negative attitude toward a major donor to Bloomsburg University, and his desire to return a major gift to that donor and his wife.

35.    JANE DOE NO. 1 asked Dr. Krug to contact the donors referred to above and a specific trustee of the University to whom JANE DOE NO. 1 had already confided.

The November 13, 2017 Meeting with
Bloomsburg University's Title IX Coordinator

36.    On November 13, 2017, Dr. Krug and JANE DOE NO. 2 accompanied JANE DOE NO. 1 to the office of the University's Title IX Coordinator, Dr. Robert Wislock.

37.    After hearing JANE DOE NO. 1 describe President Hanna's sexual harassment of her and retaliation against her, the University's Title IX Coordinator did not prepare a written report as required.   Instead, he suggested to JANE DOE NO. 1 that she "was imagining" President Hanna's sexual advances.   JANE DOE NO. 1 was sobbing when she left the meeting.   JANE DOE NO. 1 then returned to President Hanna's office, where she felt emotionally and physically threatened.

38.    On November 15, 2017, JANE DOE NO. 1 returned to the Title

IX office.   The Title IX Coordinator again downplayed JANE DOE NO. 1's

expressed concerns.   The Title IX Coordinator even laughed when JANE

DOE NO. 1 expressed her fear that she would be terminated.

The Beginning of the Retaliation Against Dr. Krug and JANE DOE NO. 2

39.    The same week that Dr. Krug accompanied JANE DOE NO. 1

to the Title IX office, retaliation against him began.   An employee who

defendant Krause had recently placed as a temporary assistant to Dr. Krug

used a master key to enter Dr. Krug's office.   Upon finding Dr. Krug in his

office, she quickly turned around and left without comment.

40.    JANE DOE NO. 2 and two other assistants to Dr. Krug reported

that their drawers had been rummaged through.

41.    JANE DOE NO. 2 was on her computer and watched her

emails changing from "unread" to "read" right before her eyes.

42.    On November 20, 2017 Dr. Krug discovered that his computer

had been tampered with and his desk drawer had been rummaged through.

Dr. Krug immediately called University police, who came to his office to

view his computer and drawers.   A formal report was subsequently filed

10

with University police.   As a result of these events, Dr. Krug's staff feared

continued retaliation by defendant Krause and his staff, and believed that

their jobs were threatened.

43.   The following week, PASSHE attorneys met with JANE DOE

NO. 1 at Panera Bread in Bloomsburg, supposedly about her Title IX

complaint.   JANE DOE NO. 2 accompanied JANE DOE NO. 1 to the

interview to act as her advisor but was told by Cathleen McCormack, one of

the two PASSHE attorneys present, that she would not be permitted to

attend the interview and should leave.   Therefore, JANE DOE NO. 1 spoke

with the two attorneys without anyone else present.

44.   Instead of focusing on the sexual harassment of JANE DOE

NO. 1 by President Hanna that she had reported, the attorneys focused

their interview on JANE DOE NO. 1's interactions with Dr. Krug.

45.   When Dr. Krug was interviewed by the attorneys two weeks

later, the attorneys likewise showed little interest in JANE DOE NO. 1's

complaint and focused again on Dr. Krug's involvement.

46.   Because JANE DOE NO. 2 witnessed her emails being read by

someone accessing her computer off-site, and Dr. Krug had reported to

University police that someone had accessed his computer and rummaged

11

through his office drawers, Dr. Krug suspected that his emails were also being read.   Dr. Krug therefore asked the PASSHE attorneys not to communicate with him through his University email.   Nonetheless, the PASSHE attorneys ignored that request and contacted Dr. Krug by University email shortly thereafter, revealing significant detail of their conversation with Dr. Krug from their interview in the email, thereby subjecting Dr. Krug to further retaliation.

Defendant Krause's Retaliation

47.    Shortly after JANE DOE NO. 1 made her Title IX complaint, defendant Krause began a campaign of retaliation against Dr. Krug.

48.    Krause began rejecting Dr. Krug's business travel.

49.    Krause started delaying reimbursement of Dr. Krug's business expenses.

50.    Krause demanded that Dr. Krug attend meetings that other deans were not required to attend.

51.    This retaliation made it more difficult for Dr. Krug to be effective in his role as Dean, and delayed implementation of strategic initiatives.

52.    This retaliation also caused financial hardship for Dr. Krug and his family, as Dr. Krug had difficulty obtaining routine reimbursement for business activities.

Retaliation by Creating False Rumors

53.    On January 4, 2018, Dr. Krug and JANE DOE NO. 2 learned that the administrative assistants to President Hanna and Interim Provost Krause were spreading rumors that Dr. Krug and JANE DOE NO. 2 were engaged in a sexual relationship.   A staff member who Krause had installed in the office next to Dr. Krug also joked that staff had made comments that Dr. Krug was also involved in a sexual relationship with her.

54.    There was no sexual relationship between Dr. Krug and JANE DOE NO. 2.   There was also no sexual relationship between Dr. Krug and his "assistant."

Dr. Krug's and JANE DOE NO. 2's Title IX Complaints

55.    The next day, January 5, 2018, Dr. Krug and JANE DOE NO. 2 went to the Title IX Coordinator to make their own Title IX complaints.

13

56.    The complaints focused on the false rumors of a sexual affair being spread by the administrative assistants to President Hanna and Interim Provost Krause.

57.    The Title IX Coordinator eventually took the complaints, but exhibited obvious reluctance to do so because, upon information and belief, the persons likely behind the false rumors were the president and interim provost of the University.

58.    Instead of offering to file a complaint, the Title IX coordinator, Robert Wislock, interrogated Dr. Krug about his relationships with people across campus.   Dr. Krug objected to this tactic, which he viewed as threatening.   He expressed this view to Dr. Wislock, that no high-level official should attempt to deter him or his assistant from filing a Title IX complaint, which was their legal right.

59.    Defendants should have (a) stopped the harassment of Dr. Krug; (b) investigated the harassment of Dr. Krug; (c) prevented further harassment of Dr. Krug; and (d) remedied the effects of the harassment against Dr. Krug.

60.    Defendants did not do or attempt to do any of these things.

The Retaliatory Investigation of Dr. Krug Begins

61.    On January 11, 2018, one week after Dr. Krug and JANE DOE NO. 2 made their own Title IX complaints, Dr. Krug learned that defendant PASSHE was investigating him.

62.    PASSHE retained the Philadelphia law firm of Ballard Spahr LLP to conduct an "investigation" of Dr. Krug, specifically into "disclosure of personnel matters not of public concern and information protected by the Family Educational Rights and Privacy Act."

63.    In fact, the "investigation" was simply retaliation against Dr. Krug for assisting JANE DOE NO. 1 in her Title IX complaint against President Hanna, and for Dr. Krug's own Title IX complaint.

64.    As discussed below, Dr. Krug had not violated any provision of law or policy.   But the outcome of the "investigation" was predetermined – it was a sham.

65.    Dr. Krug was ordered to submit to an interview – under threat of termination from Krause.   Dr. Krug submitted to the interview.

66.    Dr. Krug asked for copies of whatever law or policies he was suspected of violating.   But Dr. Krug was not provided with such information or documents.

15

67.    During the Ballard Spahr "interview" of Dr. Krug, the attorneys did not record the interview.   Instead, they took selective notes.

68.    Their ultimate report, dated February 21, 2018, inaccurately summarized "witness" statements during interviews.   The report is riddled with misstatements and excludes crucial facts.   Ballard Spahr attorneys even misquoted Dr. Krug's own comments during his "interview" in ways that implied fault, when accurate reporting of Dr. Krug's comments would have clearly shown innocence.   This act appears to have been done deliberately to support a pretextual conclusion of fault.

69.    The conclusion, which upon information and belief was pre-determined, was that Dr. Krug had violated University policy by breaching confidentiality protections afforded to private personnel information and sexual harassment/Title IX investigations, and that he had violated the Family Educational Rights and Privacy Act ("FERPA").

70.    In addition to the fact that the "investigation" and its report were highly selective in what they chose to include or exclude from the report, the conclusions are nonsensical.

71.    For example, FERPA provides that "the term 'education records' means, except as may be provided otherwise in subparagraph (B),

16

those records, files, documents, and other materials which-- **(i)** contain

information directly related to a student; and **(ii)** are maintained by an

educational agency or institution or by a person acting for such agency or

institution."[3]

72.    Dr. Krug did not provide any person with any "records, files,

documents or other materials" concerning JANE DOE NO. 1

73.    Further, JANE DOE NO. 1 came to Dr. Krug as a full-time

employee of the University who was being sexually harassed by her boss.

She did not come to Dr. Krug as a student, although she also was a part

time student.

74.    Thus, there were no educational records, and JANE DOE NO.

1's relevant capacity was as an employee, not as a student.

75.    The conclusion that Dr. Krug somehow violated FERPA is thus

absurd on its face.

76.    With respect to University confidentiality policy, the policy

provides:

> **Confidentiality and Records.** During the **complaint process**, the University will make every effort to assure

---

[3] 20 U.S.C. § 1232(g)(a)(4)(A).

confidentiality and protect the privacy rights of the Complainant and the Respondent. To the extent possible, the information reported and disclosed in a complaint and related proceedings will be shared only with individuals responsible for addressing the complaint. The University will maintain an appropriate record in the confidential files of the Department of Equity and Accommodations. All documents related to the proceedings will be subject to confidentiality protections provided by law, including the Family Educational Rights and Privacy Act (FERPA).

77.    The complaint process is defined as:

**Process:** The Department of Equity and Accommodations will communicate and cooperate with the Office of Chief Counsel, PASSHE, to identify the individual or office who will investigate the specific complaint. The investigator will forward a report to the Chancellor for review and final determination by the Chancellor or designee.

78.    Thus, while the report was highly selective in what it included and excluded, Dr. Krug could not have violated the confidentiality policy. The persons to whom the report concludes Dr. Krug spoke were not provided with information, even under the report's understanding of the facts, with information about the "complaint process."   At most, even under the report's understanding, they were told about a complaint about sexual harassment, but not about the "complaint process."

18

79.    And it bears repeating: the report was wrong and selective in the facts it chose to include or to exclude because, upon information and belief, the result was predetermined.

80.    Moreover, JANE DOE NO. 1 had given Dr. Krug permission to discuss her sexual harassment situation.

81.    Yet Ballard Spahr chose not to speak with JANE DOE NO. 1

82.    Ballard Spahr also chose not to speak with the other important witnesses, including Dr. Krug's father and sister, and the potential donor who had decided not to donate and was part of the focus of the "investigation."

83.    Incredibly, Ballard Spahr also opined that, even though Dr. Krug and JANE DOE NO. 2 together made a Title IX complaint to the University's Title IX coordinator about retaliation they had jointly suffered, including the rumors that they were engaged in an extramarital affair, that Dr. Krug's discussion with his father about it somehow breached confidentiality.

Defendants and Their Agent Ballard Spahr Were Acutely Aware That
They Were Violating Dr. Krug's First Amendment Free Speech Rights

84.    All the defendants are state entities or employees of state

entities.    They all, therefore, acted under color of state law.

85.    Because the defendants were all state entities or employees of

state entities, they were required not to violate the constitutional rights of

others.

86.    Employees of a state entity, just like other citizens, have free

speech rights protected by the First Amendment to the United States

Constitution.

87.    But such governmental employees' First Amendment free

speech rights are somewhat limited.    Their right to speak on "matters of

public concern" is maintained, while matters of purely private concern are

not First Amendment protected by governmental employees.

88.    Defendants and their agent Ballard Spahr were acutely aware

that they were punishing Dr. Krug for exercise of his free speech rights

protected by the First Amendment.    They revealed their awareness of Dr.

Krug's First Amendment free speech rights by repeatedly stating in

document after document that they were investigating disclosure of information "not of public concern."

89.    In fact, allegations of sexual harassment by a university president are indeed a matter of public concern.   Allegations of retaliation for assisting an employee to complain about sexual harassment by a university president are also matters of public concern.

90.    By repeating over and over that the matter was "not a matter of public concern," defendants and their agent Ballard Spahr "doth protest too much."[4]   Their constant cognizance of matters of public concern and their diligence in falsely stating that Dr. Krug's speech was not a matter of public concern, betray that they knew they were violating Dr. Krug's First Amendment rights.

The Disciplinary Proceedings Against Dr. Krug

91.    After Ballard Spahr issued its report, the University and PASSHE commenced disciplinary proceedings against Dr. Krug.

---

[4] William Shakespeare, *Hamlet*, Act III, Scene II (c. 1600).

92.    Dr. Krug had a pending Title IX complaint against Krause for his retaliation against Dr. Krug for assisting JANE DOE NO. 1 in her Title IX complaint.

93.    Krause was one of the "witnesses" interviewed by Ballard Spahr.

94.    Nonetheless, despite Krause's obvious bias and self-interest, the University, PASSHE and Hanna appointed Krause as the "arbiter" of the disciplinary proceeding.    The "arbiter" was the ultimate decisionmaker.

95.    On March 19, 2018, Dr. Krug formally objected to Krause as the "arbiter," or decider of Dr. Krug's fate.

96.    Dr. Krug subsequently appealed in writing to PASSHE Interim Chancellor Karen Whitney to disqualify Krause as arbiter on the basis that he had significant interest in finding Dr. Krug culpable.

97.    Nonetheless, neither the University, PASSHE, Hanna, or Krause himself, saw fit to appoint a truly neutral arbiter, without any bias and without a pending proceeding by Dr. Krug against him or her.

98.    Despite the obvious conflict in Krause judging a person who had a pending proceeding against him, on March 20, 2018, the day after

Dr. Krug's formal objection, PASSHE responded by an email which stated,

"no conflict of interest has been identified."

The Termination of Dr. Krug

99.    On March 21, 2018, the day after PASSHE summarily

dismissed Dr. Krug's objection to a biased decisionmaker, Krause,

individually and on behalf of the University, PASSHE and Hanna,

terminated Dr. Krug's employment with the University.

100.   The termination of Dr. Krug constituted further retaliation for his

assistance provided to JANE DOE NO. 1 in making her Title IX complaint,

and also as retaliation for Dr. Krug's own Title IX complaint.

Defendants Created and Spread Other Rumors of Extramarital Affairs

101.   In addition to the false rumor that Dr. Krug and JANE DOE NO.

2 were having an extramarital affair, defendants created and spread other

false rumors that Dr. Krug was having other extramarital affairs.

102.   Defendants spread a rumor that Dr. Krug was having an

extramarital affair with another assistant, C.K.

103.   Defendants spread a rumor that Dr. Krug was having an

extramarital affair with a professor, JANE DOE NO. 3.

104.   These rumors, for which defendants were responsible, were all false.

105.   The purpose of the rumors was both to retaliate against Dr. Krug for assisting JANE DOE NO. 1 with her sexual harassment complaint and her complaint about financial improprieties, and also to attempt to discredit Dr. Krug.

106.   The rumors quickly spread to the community.   Dr. Krug's wife and children heard about the rumors.

107.   JANE DOE NO. 3's husband heard about the rumor relating to JANE DOE NO. 3.   JANE DOE NO. 3's husband sent Dr. Krug a threatening message through social media, which included a threat to show up on Dr. Krug's "doorstep."

The Effect on Dr. Krug

108.   As a result of defendants' actions and inactions described above, Dr. Krug suffered both economic and emotional harm.

## COUNT ONE
### (20 U.S.C. § 1681(a) *et seq*.)
### (Against Bloomsburg University and PASSHE)

109.   Plaintiff hereby incorporates all prior paragraphs herein as if set forth at length.

110.   Dr. Krug assisted JANE DOE NO. 1 in making a complaint that she had been sexually harassed.

111.  Defendants Bloomsburg University and PASSHE retaliated against Dr. Krug for assisting JANE DOE NO. 1 in reporting an unlawful employment practice in violation of Title IX, 20 U.S.C. § 1681(a) *et seq*.

112.   As a result of such retaliation, Dr. Krug was damaged.

## COUNT TWO
### (20 U.S.C. § 1681(a) *et seq*.)
### (Against Bloomsburg University)

113.   Plaintiff hereby incorporates all prior paragraphs herein as if set forth at length.

114.   Dr. Krug made a complaint that he was being retaliated against for assisting another person in making a complaint of sexual harassment.

115.  Defendants Bloomsburg University and PASSHE retaliated against Dr. Krug for making his own complaint that he was being retaliated

against for assisting JANE DOE NO. 1 and reporting an unlawful

employment practice in violation of Title IX, 20 U.S.C. § 1681(a) *et seq*.

116.   As a result of such retaliation, Dr. Krug was damaged.

## COUNT THREE
### (42 U.S.C. § 1983)
### (Against Bashar Hanna and James Krause)

117.   Plaintiff hereby incorporates all prior paragraphs herein as if set

forth at length.

118.   Defendants Hanna and Krause retaliated against Dr. Krug

because Dr. Krug exercised his First Amendment rights to engage in

speech.

119.   Dr. Krug's speech assisting JANE DOE NO. 1 in complaining

about sexual harassment by Hanna was a matter of public concern.

120.   Dr. Krug's speech assisting JANE DOE NO. 1 in complaining

about financial improprieties by Hanna was a matter of public concern.

121.   Dr. Krug's speech about retaliation against JANE DOE NO. 2

for assisting JANE DOE NO. 1 was a matter of public concern.

122.   Dr. Krug's speech about retaliation against himself for assisting

JANE DOE NO. 1 was a matter of public concern.

123.  As a result of Hanna's and Krause's retaliation against Dr. Krug for exercising free speech rights on matters of public concern, Mr. Krug was damaged.

## COUNT FOUR
### (42 U.S.C. § 1983)
### (Against Bashar Hanna and James Krause)

124.  Plaintiff hereby incorporates all prior paragraphs herein as if set forth at length.

125.  Defendants Hanna and Krause conspired with each other and with others to retaliate against Dr. Krug because he exercised his First Amendment free association and free speech rights.

126.  As a tenured faculty member, Dr. Krug had a property right in his position within Bloomsburg University.

127.  Defendants terminated plaintiff's employment in violation of the Due Process Clause of the Fourteenth Amendment, in that (a) they did not provide Dr. Krug with a hearing, as required by the Fourteenth Amendment and *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985), (b) the disciplinary process against Dr. Krug, although not a hearing, had a predetermined outcome, and (c) Hanna appointed Krause as the arbiter, or

decisionmaker, despite the fact that Dr. Krug had an ongoing internal Title IX retaliation complaint against Krause.

128.   Because due process requires a hearing, because due process requires that an outcome not be predetermined, and because due process requires that a decisionmaker not be biased, the process defendants Hanna and Krause used against Dr. Krug was a sham and violated Dr. Krug's due process rights.

129.   Defendants Hanna's and Krause's conduct therefore was a deprivation, under color of state law, of rights guaranteed to the plaintiff under the Fourteenth Amendment to the United States Constitution.

130.   Defendants Hanna and Krause thus deprived Dr. Krug of property without due process of law.

131.   As a result of defendants' violations of Dr. Krug's Constitutional rights, Dr. Krug suffered substantial injuries and damage.

_____

<u>COUNT FIVE</u>
43 Pa.C.S. §1421 *et seq.*
Pennsylvania Whistleblower Law—Retaliation (PWL)

132.  Plaintiff hereby incorporates all prior paragraphs herein as if set forth at length.

133.  Plaintiff was a "whistleblower" as that term is defined in 43 P.S. §1422, and he reported "wrongdoing" and/or "waste" as those terms are defined in 43 P.S. §1422.

134. Plaintiff was discriminated and/or retaliated against at work for reasons expressly prohibited by 43 P.S. §1423, including reporting "wrongdoing" and/or "waste."

135. Defendants Bloomsburg University and PASSHE are directly responsible for the discrimination and/or retaliation, as they are the "employer" which disciplined Dr. Krug and terminated his employment.

136. Defendants Hanna and Krause, individually and acting for Bloomsburg University and PASSHE, are responsible for the discrimination and/or retaliation, in that they conspired and acted in concert with each other and with Bloomsburg University and PASSHE, to have Mr. Krug disciplined and terminated from his employment.

137.   As a result of such unlawful employment practices, plaintiff suffered damages.

## COUNT SIX
### (Defamation)
### (Against all Defendants)

138.   Plaintiff hereby incorporates all prior paragraphs herein as if set forth at length.

139.   Defendants, individually and through their agents, spread false rumors that Dr. Krug was having at least three extramarital affairs.

140.   Such rumors were false and defamatory.

141.   Such defamatory communications harmed Dr. Krug's reputation and lowered him in the estimation of the community.

142.   As a result of such defamatory communications, Dr. Krug has suffered damage, including impairment of reputation in the community, personal humiliation, and mental anguish and suffering.

WHEREFORE, plaintiff demands judgment as follows:

A.   For Count One, an amount to be determined at trial, including punitive damages, plus interest;

B.   For Count Two, an amount to be determined at trial, including punitive damages, plus interest;

C.   For Count Three, an amount to be determined at trial, including punitive damages, plus interest;

D.    For Count Four, an amount to be determined at trial, including punitive damages, plus interest;

E.   For Count Five, an amount to be determined at trial, including punitive damages, plus interest;

F.   For Count Six, an amount to be determined at trial, including punitive damages, plus interest;

G.   For back pay and front pay;

H.   For plaintiff's attorneys' fees;

I.   For the costs and disbursements incurred in this action; and

J.   For such other and further relief as the Court deems just and

proper.


DYLLER LAW FIRM          LAW OFFICE OF PATRICK T. O'CONNELL

s/ Barry H. Dyller        s/ Patrick T. O'Connell
Gettysburg House          24 West Main Street
88 North Franklin Street  Bloomsburg, PA 17815
Wilkes-Barre, PA   18701  (570) 380-1280
(570) 829-4860            Attorney for Plaintiff
Attorney for Plaintiff


<u>JURY DEMAND</u>

Plaintiff demands a trial by jury on all issues triable by a jury.

32