## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JEFFREY KRUG, | : | Civil No. 4:18-CV-1669 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| BLOOMSBURG UNIVERSITY, *et al.*, | : | |
| | : | |
| Defendants. | : | Judge Jennifer P. Wilson |

### MEMORANDUM

Before the court are cross motions for summary judgment.  Plaintiff filed a motion for summary judgment on his due process claims on March 17, 2022. (Doc. 79).  Defendants then filed a motion for summary judgment on all of Plaintiff's claims on May 9, 2022.  (Doc. 88.)  The court finds that summary judgment is not an appropriate vehicle to resolve the claims in this case, as disputes of material fact exist on every claim.  Therefore, both motions will be denied.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]

Defendant Bloomsburg University ("BU") is an institute of higher education under the control and operation of the Commonwealth of Pennsylvania by virtue of

---

[1] In considering the instant cross-motions for summary judgment, the court relied on the following uncontested facts, or where the facts were disputed, viewed the facts and deduced all reasonable inferences therefrom in the light most favorable to the nonmoving party in accordance with the relevant standard for deciding a motion for summary judgment.  However, although the parties have thoroughly detailed the facts supporting their positions and responded to the facts set out by opposing counsel, the court has carefully reviewed the parties' submissions and determined that there are too many disputes of material fact to warrant granting summary judgment to either party on any claim.  Therefore, it is not necessary for the court to provide detailed findings of fact for the purpose of resolving the instant motions.

its membership in Defendant Pennsylvania State System of Higher Education ("PASSHE").  (Doc. 80, ¶ 1.)  Plaintiff Dr. Jeffrey Krug ("Dr. Krug") was Dean of the College of Business at BU beginning June 1, 2015.  (*Id.* ¶ 2.)  In July 2017, Defendant Bashar Hanna ("President Hanna") was named the new president of BU.  (*Id.* ¶ 4.)  In the fall of 2017, Defendant James Krause ("Krause") was the interim provost at BU.  (*Id.* ¶ 3.)

During the time period at issue, Judy Rostucher ("Rostucher") was Dr. Krug's administrative assistant and Angela Crossley ("Crossley") was President Hanna's administrative assistant.  (*Id.* ¶ 5.)  During the 2017-2018 academic year, Robert Wislock ("Wislock") was BU's Title IX Coordinator.  (*Id.* ¶ 6.)  Terry and JoAnn Zeigler were benefactors of BU, and the business school is formally named after them as the Terry and JoAnn Zeigler College of Business.  (*Id.* ¶ 7.)  President Hanna asked Terry Zeigler to serve as Dr. Krug's executive coach and Dr. Krug was permitted to discuss business concerns with Terry Zeigler in this context.  (*Id.* ¶ 8.)  Andrew Lehman ("Chief Counsel Lehman") was chief counsel for PASSHE from July 2013 until April 2022.  (*Id.* ¶ 9; Doc. 89, ¶ 9.)

On September 14, 2016, then-President of BU, David Soltz, granted Dr. Krug tenure in accordance with Article 15 of the agreement between the Association of Pennsylvania State College and University Faculties and PASSHE ("Agreement").  (Doc. 80, ¶ 10.)  Article 15 of the Agreement provides that

"[t]enure shall mean the right of a FACULTY MEMBER to hold his/her position and not to be removed therefrom except for just cause as hereinafter set forth in this Article or except as provided elsewhere in this Agreement."  (*Id.* ¶ 11.)

While these facts are undisputed, factual disputes arise as to whether Dr. Krug was a tenured or an at-will employee because Dr. Krug was not assigned an academic rank or appointed as a faculty member.  (Doc. 89, ¶ 11, 122–23; Doc. 96, ¶ 123.)  On March 9, 2018, President Hanna wrote a letter to Dr. Krug stating that Dr. Krug was an at-will employee.  (Doc. 80, ¶ 12.)

On October 30, 2017, Crossley reported to Dr. Robert Dampman, a member of the University Council of Trustees, that President Hanna had touched her inappropriately, that Hanna was making sexual advances, and that he retaliated against her when she rebuffed him.  (*Id.* ¶ 15.)  Crossley also confided in Rostucher that President Hanna touched her inappropriately and Rostucher reported these allegations to Dr. Krug.  (*Id.* ¶ 16.)  Dr. Krug and Dr. Dampman later discussed Crossley's allegations.  (*Id.* ¶ 17.)

On November 11, 2017, Dr. Krug phoned Terry Zeigler, who put the call on speakerphone while with his wife, JoAnn.  (*Id.* ¶ 18.)  During the call, Dr. Krug advised Terry Zeigler that President Hanna may be seeking to return the Zeiglers' donation and also that a female subordinate of President Hanna's was alleging that President Hanna engaged in inappropriate behavior with her.  (*Id.*)  Several details

3

of this call, including whether identifying information about the complainant was revealed are disputed.  (*Id.*; Doc. 89, ¶ 18.)

Dr. Krug's father, Alan Krug, has had a career in public policy and legislative consulting.  (Doc. 80, ¶ 19.)  Alan Krug was a lobbyist within the Pennsylvania legislature and was friendly with many legislators, including legislators who were PASSHE board members.  (*Id.*)  Dr. Krug spoke to his father about a woman coming to him with sexual harassment allegations and asked his father's advice.  (*Id.* ¶ 20.)  Several details of this call, including whether identifying information about the complainant was revealed are disputed.  (*Id.*; Doc. 89, ¶ 20.)  Alan Krug advised Dr. Krug to contact Angela Johnston ("Johnston"), Dr. Krug's sister, as she was Chief of Staff to the President at the College of Wooster and was trained and experienced with handling sexual harassment cases in a university setting.  (Doc. 80, ¶ 21.)

Dr. Krug called Johnston and explained that a woman in his office advised that another woman at the institution was alleging sexual harassment.  (*Id.* ¶ 22.)  Several details of this call, including whether identifying information about the complainant was revealed are disputed.  (*Id.*; Doc. 89, ¶ 22.)  Johnston advised that as a result of Dr. Krug's position at BU, he was a mandated reporter because he was not a confidential resource, like a chaplain.  (Doc. 80, ¶ 23.)

Having received this advice, Dr. Krug advised Crossley that he was a mandated reporter, and that if she did not report her allegations to Wislock, the Title IX Coordinator, Dr. Krug was obligated to do so.  (*Id.* ¶ 26.)  On November 13, 2017, Crossley, accompanied by Rostucher and Dr. Krug, went to the Title IX office and reported the sexual harassment allegations against President Hanna to Wislock.  (*Id.* ¶ 27.)  No official Title IX complaint was filed.  (*Id.* ¶ 27.)  PASSHE conducted an investigation into the sexual harassment allegations and concluded that Wislock did not properly handle Crossley's allegations because he should have immediately notified the state system that he received allegations against the University President.  (*Id.* ¶ 32.)

Johnston advised Dr. Krug to provide her phone number to Crossley to call for advice if she wanted to, although Johnston did not know Crossley's name or job title.  (*Id.* ¶ 34.)  Dr. Krug complied.  (*Id.* ¶ 35.)  Crossley did call Johnston. (*Id.* ¶ 36.)  Subsequently, Johnston spoke to Alan Krug and disclosed both Crossley's and President Hanna's identities in relation to the sexual harassment allegations.  (*Id.* ¶ 38.)

In the months that followed, Dr. Krug and Rostucher felt that they were being retaliated against in numerous ways for assisting Crossley in reporting sexual harassment.  (*Id.* ¶¶ 42–50.)  Defendants dispute their involvement in the alleged retaliatory acts and the admissibility of statements about the actions.  (Doc. 89, ¶¶

42–50.)  Dr. Krug and Rostucher went to Wislock to file a complaint alleging retaliation for assisting Crossley in making a Title IX complaint, asserting that Krause's and President Hanna's administrative assistants, at Krause's and/or President Hanna's direction, were spreading rumors that Dr. Krug and Rostucher were engaged in a sexual affair, thus creating a hostile work environment.  (Doc. 80, ¶¶ 51–53.)  William Helzlsouer was appointed by PASSHE to investigate Dr. Krug's and Rostucher's complaints of retaliation.  (*Id*. ¶ 54.)  Helzlsouer's report confirmed that rumors of a sexual affair were being spread, but also that there was insufficient evidence to trace the origination of the rumors back to Dr. Krug's and Rostucher's assistance of Crossley.  (*Id.* ¶ 55; Doc. 89, ¶ 55; Doc. 81-36, pp. 5–6.)

On January 11, 2018, Dr. Krug received a letter from BU Human Resources director Jerry Reed informing him that PASSHE had initiated an investigation into Dr. Krug's conduct as Dean of the College of Business, to investigate "the disclosure of personnel matters not of public concern and information protected by the Family Education Rights and Privacy Act, among other issues."  (Doc. 80, ¶ 56.)  Chief Counsel Lehman retained the law firm Ballard Spahr to act was investigators on PASSHE's behalf.  (*Id.* ¶ 57.)

Dr. Krug received a letter in which he was directed to attend an interview with Olabisi Ladeji Okubadejo and Meredith Swartz Dante ("the Ballard Spahr attorneys").  (*Id.* ¶ 58.)  Krause emailed Dr. Krug on January 12, 2018, advising

him that failure to participate in the university investigation interview would result in discipline up to and including termination. (*Id.* ¶ 59.) The Ballard Spahr attorneys emailed Dr. Krug's counsel, Brian Caffrey, that Dr. Krug was required to attend the interview without counsel. (*Id.* ¶ 60.)

There was no notetaker or stenographer present to verify the accuracy of what the Ballard Spahr attorneys wrote down during any of the interviews they conducted, including Dr. Krug's interview. (*Id.* ¶ 67.) Ultimately, the Ballard Spahr attorneys authored a report of their findings ("the Ballard Spahr report"), concluding that Dr. Krug "made disclosures of private personnel information and confidential student information" to four individuals—"his father, J[oAnn] Zeigler, E. Evans, and N. Guiffre." (*Id.* ¶ 68.) The Ballard Spahr attorneys did not interview Crossley, Alan Krug, or Johnston. (*Id.* ¶ 69.) The Ballard Spahr report indicates that Chris Jones, an attorney employed by PASSHE, was interviewed, but no summary of his interview was included. (*Id.* ¶¶ 70–71.) Dr. Krug contested allegations made by other individual during the Ballard Spahr attorneys' interviews and urged the attorneys to contact and interview John Braganini. (*Id.* ¶¶ 72–73.) The Ballard Spahr attorneys did not interview John Braganini. (*Id.* ¶ 74.) John Braganini's declaration directly refutes some information contained within the Ballard Spahr report. (*Id.* ¶ 75.)

PASSHE directed President Hanna to delegate decision-making authority regarding a personnel matter to someone else, as President Hanna needed to be walled off from the decision-making process.  (*Id.* ¶ 76; Doc. 89, ¶ 76.)  President Hanna chose Krause, who was the second ranking officer at BU.  (Doc. 80, ¶ 77; Doc. 89, ¶ 76–77.)

Following the release of the Ballard Spahr final report on March 7, 2018, a pre-disciplinary conference ("PDC") was scheduled for Dr. Krug on March 9, 2018.  (Doc. 80 ¶ 78.)  In advance of the PDC, Krause intended to send Dr. Krug a summary of the Ballard Spahr report, but inadvertently sent Dr. Krug the full Ballard Spahr report.  (*Id.* ¶ 78; Doc. 89, ¶ 78.)

On March 8, 2018, before the PDC was held, Suzanne Williamson ("Williamson"), University Legal Counsel for PASSHE, emailed Krause suggested language for disciplining Dr. Krug.  (Id. ¶ 102.)  The suggested language related only to termination.  (*Id.*)  Defendants concede that Krause was "leaning toward" termination prior to the PDC.  (Doc. 89, ¶¶ 102, 145–46.)  Defendants assert that Krause wanted to hear what Dr. Krug had to say before making a final decision, however, and that Krause was merely planning for termination as a potential outcome.  (*Id.* ¶¶ 102–03.)  Later that evening, Krause emailed Williamson back, attaching "draft emails to four key constituencies on campus," all of which

announced Dr. Krug's termination, effective March 21, 2018.  (Doc. 80, ¶¶ 103–04.)

Krause, PASSHE Assistant Vice Chancellor for Employee and Labor Relations Lisa Sanno ("Ms. Sanno"), and Human Resources Specialist Aubry McConnell ("Ms. McConnell") were present for Dr. Krug's PDC on March 9, 2018.  (Doc. 80, ¶ 80.)  During the PDC, Dr. Krug objected to Krause being appointed as arbiter because he felt Krause was not a disinterested party.  (*Id.* ¶ 82.)  Ms. Sanno interrupted Dr. Krug and directed him to focus on his actions rather than the actions of Krause and President Hanna.  (*Id.* ¶ 83–84; Doc. 89, ¶ 83.)  Dr. Krug continued to object to Krause's involvement throughout his PDC. (Doc. 80, ¶¶ 85–86.)  Dr. Krug also objected to his inability to have counsel present at the PDC, noting that President Hanna was permitted to have counsel present at his PDC relating to Crossley's allegations, as Dr. Krug felt the process and this discrepancy was unfair.  (*Id.* ¶ 87.)

During the PDC, Dr. Krug noted that he never spoke with his father or sister about Crossley's allegations *after* she reported the conduct to Wislock, so BU's policy prohibiting disclosure of such allegations did not apply, as no formal complaint had been made at the time he spoke with his father and sister.  (*Id.* ¶¶ 88–91.)  Dr. Krug noted the same as to conversations he had with Nick Giuffre and the Zeiglers.  (*Id.* ¶¶ 92–93.)  Following the PDC, Dr. Krug submitted a written

memo to Krause, Ms. Sanno, and Ms. McConnell again objecting to Krause's involvement.  (*Id.* ¶ 95.)  Dr. Krug also attached an email sent to PASSHE Interim Chancellor Karen Whitney requesting that a new arbiter outside of BU be appointed.  (*Id.* ¶ 96.)  Chancellor Whitney did not respond, but Chief Counsel Lehman responded, indicating that no conflict of interest had been identified.  (*Id.* ¶ 97.)

Because Dr. Krug complained about not having sufficient time prior to the PDC to review the Ballard Spahr report, Krause gave Dr. Krug until March 12, 2018 to review the report and provide a response.  (Doc. 89, ¶ 143.)  Dr. Krug submitted a ten-page written response to the Ballard Spahr report on March 12, 2018.  (*Id.* ¶ 144.)

Dr. Krug received a letter from Krause terminating his employment at BU on March 21, 2018.  (*Id.* ¶ 100.)  Dr. Krug was walked off campus in front of faculty and staff during what he testified was the most humiliating day of his life.  (*Id.* ¶ 101.)  Following Dr. Krug's termination, BU circulated a two-page statement about his termination to the press, the students and faculty, presidents of PASSHE institutions, and to BU's Council of Trustees.  The statement details the actions leading to Dr. Krug's termination and concludes that his "actions should be considered an act of wanton or willful disregard of the University's interests and the interests of the employee/student he disclosed information about."  (Doc. 81-

37, p. 2.)  The statement further states that Dr. Krug deliberately violated

University policy, applicable law (FERPA), principles of confidentiality

protections afforded to Title IX complaints and personnel matters, and disregarded

standards of behavior, including compliance and leadership responsibilities as a

Dean.  (*Id.*)  When searching for new employment, the circumstances of his

termination, as well as the instant lawsuit, were cited as concerns by prospective

employers.  (Doc. 80, ¶¶ 111–16.)

 Dr. Krug initiated this action by filing a complaint on August 22, 2018.

(Doc. 1.)  An amended complaint was filed on December 29, 2018.  (Doc. 22.)

The parties stipulated that Dr. Krug could again amend his complaint.  (Doc. 53.)

On July 8, 2019, Dr. Krug filed his second amended complaint, which is now the

operative complaint.  (Doc. 54.)  Defendants filed an answer on July 18, 2019.

(Doc. 57.)  The case was reassigned to the undersigned on November 25, 2019.

The remaining claims[2] at issue in this case are:  Count 1 – retaliation in

violation of Title IX, 20 U.S.C. § 1981(a) *et seq.* against BU and PASSHE

regarding Dr. Krug's assistance of Angela Crossley in making a Title IX

complaint; Count 2 – retaliation in violation of Title IX, 20 U.S.C. § 1981(a) *et

seq.* against BU and PASSHE regarding Dr. Krug's own complaint of retaliation to

---

[2] After reviewing Defendants' arguments on counts 6 and 10 of the second amended complaint,
Dr. Krug did not contest the arguments and withdrew those claims.  (Doc. 97, p. 62.)

BU after assisting Angela Crossley; Count 3 – a violation of 42 U.S.C. § 1983 against President Hanna and Krause premised on retaliation in violation of the First Amendment; Count 4 – a violation of 42 U.S.C. § 1983 against President Hanna and Krause premised on a due process violation relating to Dr. Krug's tenure as a property interest; Count 5 – retaliation in violation of the Pennsylvania Whistleblower Law, 43 Pa.C.S. § 1421 *et seq.* against all Defendants; Count 7 – retaliation in violation of Title VII, 42 U.S.C. § 2000e-3(a) against BU and PASSHE regarding Dr. Krug's assistance of Angela Crossley in making a Title IX complaint; Count 8 – retaliation in violation of Title VII, 42 U.S.C. § 2000e-3(a) against BU and PASSHE regarding Dr. Krug's own complaint of retaliation to BU after assisting Angela Crossley; Count 9 – a violation of 42 U.S.C. § 1983 against President Hanna and Krause premised on a due process violation relating to Dr. Krug's reputation as a liberty interest; Count 11 – retaliation in violation of the Pennsylvania Human Rights Act, 43 Pa.C.S. § 955(d) against all Defendants regarding Dr. Krug's assistance of Angela Crossley in making a Title IX complaint; and Count 12 – retaliation in violation of the Pennsylvania Human Rights Act, 43 Pa.C.S. § 955(d) against all Defendants regarding Dr. Krug's own complaint of retaliation to BU after assisting Angela Crossley.  (*See* Doc. 54, pp. 25–37.)

Dr. Krug filed his motion for summary judgment, statement of material facts, exhibits, and brief in support on March 17, 2022.  (Docs. 79–83.)  Defendants filed their motion for summary judgment, statement of material facts, and brief in support on May 9, 2022.  (Docs. 88–90.)  The brief in support of Defendants' motion was also a brief in opposition to Dr. Krug's motion for partial summary judgment, by agreement of the parties.  (Doc. 73.)  Dr. Krug filed a counter-statement of material facts and brief in opposition to Defendants' motion for summary judgment, which also acted as a reply brief to his own motion for summary judgment, on June 13, 2022.  (Docs. 96–97.)  Defendants filed their reply brief on July 27, 2022.  (Doc. 108.)  Thus, the motions are ripe for disposition.

Furthermore, while the parties were briefing the instant motions for summary judgment, Defendants discovered that one of the declarations attached as an exhibit to their statement of material facts was an unsigned declaration that was a draft, rather than the final, signed declaration.  Therefore, Defendants filed a motion to amend/correct the summary judgment record on July 14, 2022.  (Doc. 100.)  In response, Dr. Krug filed a motion to strike the declaration entirely.  (Doc. 101.)  The court denied Dr. Krug's motion to strike and granted Defendants' motion to amend/correct the summary judgment record on January 23, 2023.  (Docs. 111–12.)

## STANDARD OF REVIEW

A court may grant a motion for summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is material if resolution of the dispute "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is not precluded by "[f]actual disputes that are irrelevant or unnecessary." *Id.* "A dispute is genuine if a reasonable trier-of-fact could find in favor of the nonmovant' and 'material if it could affect the outcome of the case." *Thomas v. Tice*, 943 F.3d 145, 149 (3d Cir. 2019) (quoting *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 300 (3d Cir. 2012)).

In reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018) (citing *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006)). The court may not "weigh the evidence" or "determine the truth of the matter." *Anderson*, 477 U.S. at 249. Instead, the court's role in reviewing the facts of the case is "to determine whether there is a genuine issue for trial." *Id.*

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The non-moving party must then oppose the motion, and in doing so "'may not rest upon the mere allegations or denials of [its] pleadings' but, instead, 'must set forth specific facts showing that there is a genuine issue for trial. Bare assertions, conclusory allegations, or suspicions will not suffice.'" *Jutrowski*, 904 F.3d at 288–89 (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014)).

Summary judgment is appropriate where the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**DISCUSSION**

Dr. Krug's motion for partial summary judgment seeks summary judgment only on his due process claims.  In contrast, Defendants' motion for summary judgment seeks summary judgment in their favor on all of Dr. Krug's claims.  The court will first address the immunity issues raised by Defendants.

### A. Immunity

#### 1. Eleventh Amendment Immunity

Defendants argue that as to Counts 3, 4, 9, and 10 of the second amended complaint, because Dr. Krug seeks compensatory damages pursuant to Section 1983, the individual Defendants are entitled to immunity pursuant to the Eleventh Amendment to the Constitution because they were acting in their official capacities.  (Doc. 90, p. 31.)

In response, Dr. Krug asserts that the individual Defendants are sued pursuant to Section 1983 in their *individual*, rather than official, capacities, so Eleventh Amendment immunity does not apply.  (Doc. 97, pp. 62–65.) Defendants' reply brief provides no further argument on this point.  (*See* Doc. 108.)

Eleventh Amendment immunity bars suit against state officials sued in their official capacities because the state is the true party in interest inasmuch as the plaintiff seeks recovery from the state treasury.  *Atwell v. Schweiker*, 274 Fed.

App'x 116, 117–18 (3d Cir. 2007) (citing *Melo v. Hafer*, 912 F.2d 628, 635 (3d Cir. 1990)).  The Eleventh Amendment does not, however, bar suits against state officials sued in their personal capacities.  *Melo*, 912 F.2d at 635.  To determine whether a plaintiff is suing a defendant in his personal capacity, official capacity, or both, courts must look to the complaint and the course of proceedings.  *Id.*  In doing so, the court in *Atwell* considered whether damages were requested from the individual and the state, whether the defendant raised a qualified immunity defense, and whether punitive damages were requested.  *Atwell*, 274 Fed. App'x at 118.  The Third Circuit has resolved doubts about the capacity in which defendants were sued in favor of a plaintiff, and assumed the plaintiff sued them in their individual capacities, where punitive damages are sought.  *Id.*

Here, the second amended complaint does not explicitly state the capacity in which Dr. Krug is suing the individual defendants.  (Doc. 54, pp. 26–27, 32.)  However, just as in *Atwell*, Dr. Krug only seeks damages from the individual defendants, rather than the state.  (*Id.*)  Furthermore, the individual defendants raised a qualified immunity defense, which is available when a defendant is sued in his individual capacity.  (Doc. 90, pp. 41–43.)  Lastly, Dr. Krug is seeking punitive damages on his Section 1983 claims.  (See Doc. 54, pp. 54–55.)  Therefore, while the complaint does not specify the capacity in which Krause and President Hanna are being sued, this ambiguity should be resolved in Dr. Krug's favor.

Accordingly, the individual Defendants are not entitled to Eleventh Amendment immunity on these claims and summary judgment on this basis is denied.

### 2. Qualified Immunity

Next, the individual Defendants assert that they are entitled to qualified immunity. (Doc. 90, pp. 41–43.) On this score, the individual Defendants argue that Dr. Krug cannot establish that any constitutional violation occurred, but even if he could, there was no clearly established violation of his constitutional rights because he was an at-will employee who was terminated after violating university policies and federal law. (*Id.* at 43.)

In response, Dr. Krug notes that terminating an employee in retaliation for exercising free speech rights under the First Amendment violates clearly established law. (Doc. 97, p. 66.) Dr. Krug also argues that a government employee reporting sexual harassment is a matter of public concern. (*Id.*) Furthermore, Dr. Krug contends that the law relating to due process in this context is clear that the decisionmaker must be neutral, that the decision cannot be predetermined, and that the hearing must not be a sham. (*Id.* at 67.) Lastly, Dr. Krug asserts that the law is clear that tenure constitutes a property interest and there is a liberty interest in one's reputation. (*Id.*) Again, the individual Defendants' reply brief does not address these arguments directly, but addresses the underlying constitutional claims at issue. (*See* Doc. 108.)

The doctrine of qualified immunity protects government officials from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* Qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Although qualified immunity is generally a question of law that should be considered at the earliest possible stage of proceedings, a genuine dispute of material fact may preclude summary judgment on qualified immunity. *Giles v. Kearney*, 571 F.3d 318, 325–26 (3d Cir. 2009).

To overcome qualified immunity, a plaintiff must show "(1) that the official violated a statutory or constitutional right and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. Al-Kidd*, 563 U.S. 731, 735 (2011). In analyzing the facts, the court has discretion to decide which of the prongs to address first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

A right is "clearly established" for qualified immunity purposes only if "the contours of the right" are "sufficiently clear that a reasonable official would

19

understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1982). Thus, defendants are entitled to qualified immunity if "reasonable officials in [their] position at the relevant time could have believed, in light of what was in the decided case law, that their conduct would be lawful." *In re Cit of Phila. Litig.*, 49 F.3d 945, 961 n.14 (3d Cir. 1995). However, for reasonable officials to be on notice that their conduct would be unlawful, there need not be "a previous precedent directly on point." *Acierno v. Cloutier*, 40 F.3d 597, 620 (3d Cir. 1994); *accord Anderson*, 483 U.S. at 640 (holding that the "clearly established" standard does not require that "the very action in question has previously been held unlawful"). Rather, there need only be "some but not precise factual correspondence between relevant precedents and the conduct at issue," *Pro*, 81 F.3d at 1292 (internal citations and quotations omitted), so that "in the light of pre-existing law the unlawfulness [would be] apparent." *Anderson*, 483 U.S. at 640.

### i. First Amendment Retaliation

A public employee seeking to state a claim for retaliation under the First Amendment must allege that "(1) his speech is protected by the First Amendment and (2) the speech was a substantial or motivating factor in the alleged retaliatory action, which, if both are proved, shifts the burden to the employer to prove that

(3) the same action would have been taken even if the speech had not occurred." *Daughter v. Sch. Dist. of Phila.*, 772 F.3d 979, 986 (3d Cir. 2014).

For the first element, a public employee's speech is protected by the First Amendment "when (1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government employer did not have 'an adequate justification for treating the employee differently from any other member of the general public' as a result of the statement he made." *Hill v. Borough of Kutztown*, 455 F.3d 225, 241–42 (3d Cir. 2006) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)).

For a public employee's speech to be protected by the First Amendment, he must have spoken as a citizen, meaning that his speech must not have been undertaken pursuant to his job responsibilities as a public employee. *See Garcetti*, 547 U.S. at 421–22. As the Supreme Court has noted, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421. However, if "the public employee's speech is not part of his ordinary job duties or is uttered as sworn testimony in a judicial proceeding, then the employee is acting as a private citizen and his speech hence may or may not be protected under the First Amendment,"

depending on whether the speech involved a matter of public or private concern. *Falco v. Zimmer*, 767 F. App'x 288, 298–99 (3d Cir. 2019).

Relative to the second factor, whether the speech involved a matter of public concern, this must be determined "by the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147–48 (1983). Speech involves a matter of public concern "when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'" *Snyder v. Phelps*, 562 U.S. 443, 453 (2011). As the Third Circuit Court of Appeals has summarized, jurisprudence in this area indicates that "speech disclosing public officials' misfeasance is protected while speech intended to air personal grievances is not." *Falco*, 767 F. App'x at 303 (quoting *Swineford v. Snyder Cnty Pa.*, 15 F.3d 1258, 1271 (3d Cir. 1994)).

At the final stage of this three-step inquiry, "courts balance 'the public employee's interest in speaking about a matter of public concern and the value to the community of [his] being free to speak on such matters' against 'the government's interest as an employer in promoting the efficiency of the services it performs through its employees.'" *Falco*, 767 F. App'x at 303–04 (quoting *Azzaro v. Cnty of Allegheny*, 110 F.3d 968, 980 (3d Cir. 1997)). "If the public employer's

interest is 'significantly greater' than the public employee's interest in contributing to the public debate, then the public employee's speech is not protected." *Id.* at 304.

Having set forth the relevant inquiries, the court now turns to the facts of this case.  At the outset, the court notes that the second amended complaint lists several instances of Dr. Krug's speech.  (Doc. 54, ¶¶ 118–122.)  However, the parties' arguments center on Dr. Krug's assistance of Crossley in making a Title IX complaint to BU.  (Doc. 90, pp. 23–25; Doc. 97, pp. 32–49.)  Thus, the court's analysis will likewise focus on that specific instance of speech.

Defendants first argue that Dr. Krug was not speaking as a citizen, as he assisted Crossley in making her report because he was considered by BU to be a mandated reporter.  (Doc. 90, p. 25.)  Dr. Krug, however, argues that all employees who were not confidential resources or limited confidential resources were deemed to be mandatory reporters at BU.  (Doc. 97, pp. 46–47.)  Additionally, Dr. Krug notes that the critical inquiry in such cases is whether the speech at issue is *ordinarily* within the scope of an employee's duties, regardless of whether it concerns those duties or contains information obtained through the course of employment.  (*Id.* at 48.)

The court agrees with Dr. Krug on this point.  Several years after *Garcetti*, the Supreme Court noted that the holding in *Garcetti* "said nothing about speech

23

that simply relates to public employment or concerns information learned in the course of public employment." *Lane v. Franks*, 573 U.S. 228, 239 (2014). Indeed, "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen— speech." *Id.* at 240. Rather, "the critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Id.* It is clear that assisting in making a Title IX complaint to BU's Title IX Coordinator was *not* ordinarily within the scope of Dr. Krug's duties as Dean of the College of Business at BU. Therefore, Dr. Krug was speaking as a citizen.

The court then turns to whether the speech involved a matter of public concern. Here, Defendants argue that Dr. Krug's speech was not a matter of public concern, but constituted merely personal grievances because the report did not involve a general pattern of sexual harassment. (Doc. 90, p. 25.) In opposition, Dr. Krug argues, citing Third Circuit case law, that speech involving government impropriety occupies the highest rung of First Amendment protection because of the public's substantial interest in discovering governmental improprieties. (Doc. 97, pp. 43–44.) Furthermore, Dr. Krug cites to *Azzaro v. Cnty of Allegheny*, 110 F.3d 968 (3d Cir. 1997), in which the Third Circuit held that speech by a government employee reporting sexual harassment was a matter

24

of public concern and was thus constitutionally protected speech. (*Id.* at 44.) Dr. Krug then notes that President Hanna is an important public figure in a small town like Bloomsburg, Pennsylvania, where BU students and faculty make up at least 42% of the town's population. (*Id.* at 44–45.)

In reviewing the *Azzaro* opinion, as well as the other aforementioned cases, the court finds Dr. Krug's speech relating to allegations of sexual harassment against a university's president are a matter of public concern. In finding that similar complaints were a matter of public concern, the *Azzaro* court noted that sexual harassment, "when practiced by those exercising authority in the name of a public official, is as much a matter of public concern as racial discrimination practiced under similar circumstances." *Azzaro*, 110 F.3d at 978. The court also expressly rejected the notion that grievances about sexual harassment are only a matter of public concern if they include indications that there is a systemic problem interfering with the public agency's performance of its governmental functions. *Id.* at 980. Additionally, it is clear that Dr. Krug's speech in this case can fairly be considered as relating to a matter of concern to the community and discloses a public official's misfeasance.[3] Therefore, the court concludes that Dr. Krug's speech was on a matter of public concern and was not merely a personal grievance.

---

[3] In so finding, the court acknowledges Defendants' arguments in their reply brief about the factual backdrop of the *Azzaro* decision and that the court explicitly noted that not all public employee complaints about sexual harassment are matters of public concern. (Doc. 108, p. 25.)

Defendants did not address the balancing of Dr. Krug's interest in speaking about a matter of public concern and the value to the community in his being free to speak on such matters against BU's interest as an employer.  (*See* Doc. 90.) Accordingly, Dr. Krug likewise did not offer an argument, but noted that in *Azzaro*, the court concluded that the public interest was sufficient to outweigh any legitimate countervailing governmental interest that might have been implicated. (Doc. 97, p. 46.)

In *Azzaro*, the court noted that striking the appropriate balance under the circumstances is not difficult, and that the public interest in such allegations clearly outweighed any countervailing governmental interest that might have been implicated.  *Azzaro*, 110 F.3d at 980.  Furthermore, the court noted that because the complainant did not work in the same office as the subject of the sexual harassment complaint and did not have an employment relationship requiring trust and confidence, the reports could not have posed threats to the government's interest in efficiency of effectiveness.  *Id.*

Because Defendants have failed to set forth a specific countervailing government interest in this matter or explain how it such (unidentified) interest would outweigh Dr. Krug's interest in speaking about a matter of great public

---

However, upon examining the reasoning used by the *Azzaro* court, as well as the relevant standard to be applied, the court easily concludes that the circumstances present in this case are such that Dr. Krug's speech involved a matter of public concern.

concern as well as the value to the community of such speech, the court concludes that the balance weighs in favor of Dr. Krug.

Having determined that Dr. Krug's speech was protected by the First Amendment, the court turns to whether the right at issue here was "clearly established." Generally, it is clearly established that speech on a matter of public concern, such as discrimination within the agency, is protected by the First Amendment. *See Connick*, 461 U.S. at 146 ("[a]lthough the subject matter of Mrs. Givhan's statements were not the issue before the Court, it is clear that her statements concerning the School District's allegedly racially discriminatory policies involved a matter of public concern"); *see also Fender v. Del. Div. of Revenue*, 628 Fed. App'x 95, 97 (3d Cir. 2015) (holding that "[g]ender discrimination is clearly a matter of political and social concern"). Additionally, "[s]peech involving government impropriety occupies the highest rung of First Amendment protection." *Feldman v. Phila. Housing Auth.*, 43 F.3d 823, 830 (3d Cir. 1994). "Moreover, the public's substantial interest in unearthing governmental improprieties requires courts to foster legitimate whistleblowing." *Id.* Furthermore, cases decided prior to Dr. Krug's termination are sufficiently similar to put reasonable officials on notice that their conduct would be unlawful. *See Azzaro*, 110 F.3d at 968; *see also Montone v. City of Jersey City*, 709 F.3d 181 (3d Cir. 2013).

27

The court acknowledges that Defendants have argued that there is no clearly established constitutional rights that have been violated in this case.  (Doc. 90, p. 43.)  However, this assertion is premised on Defendants' defining the right at issue as the termination "of an at-will employee after an independent investigation revealed that he had violated university policies and federal law."  (*Id.*)  The court is unable to conclude that this narrow definition is appropriate and has not defined the right at issue so narrowly in this opinion.

The final determination for qualified immunity purposes is whether Defendants' conduct clearly violated Dr. Krug's constitutional rights.  While this is ordinarily a question of law to be determined by the court, where the determination is dependent upon disputed factual issues, the question is more properly resolved by a jury. *Monteiro v. City of Elizabeth*, 436 F.3d 397, 405 (3d Cir. 2006) (citing *Johnson v. Jones*, 515 U.S. 304, 313 (1995)).  So it is here.  There are numerous factual disputes in this case specifically revolving around the individual Defendants' actions as they relate to the investigation, Dr. Krug's PDC, and Dr. Krug's termination.  Therefore, whether the individual Defendants' conduct clearly violated Dr. Krug's constitutional rights is entirely dependent on these disputed factual issues.  This determination is not appropriate for resolution at the summary judgment stage and will be left to a jury to resolve.  Therefore, Defendants' summary judgment motion is denied to the extent that the individual Defendants

28

seek summary judgment on Dr. Krug's First Amendment claims on the basis of qualified immunity.

## ii. Due Process – Tenure

The next constitutional claim at issue is Dr. Krug's due process claim premised on tenure as a property interest. For procedural due process claims under 42 U.S.C. § 1983, a plaintiff must allege that (1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of life, liberty, or property, and (2) the procedures available to him did not provide due process of law. *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000).

The meaning of "tenure" within PASSHE universities, including BU, was that "[t]enure shall mean the right of a faculty member to hold his/her position and not to be removed therefrom except for just cause as hereinafter set forth in this Article or except as provided elsewhere in this Agreement." (Doc. 80, ¶ 11; Doc. 89, ¶ 11.) However, a factual dispute exists as to whether or not Dr. Krug held a tenured position at BU. (*See* Doc. 89, ¶ 11.)

Defendants do not appear to dispute that if Dr. Krug held a tenured position at BU, that he had a property interest in continued employment. Indeed, Defendants could not do so, as it is clear that there is a property interest in continued employment where tenured employees have been informed that they may only be terminated for cause. *See Gilbert v. Homar*, 520 U.S. 924, 928–29

29

(1997) (holding that "public employees who can be discharged only for cause have a constitutionally protected property interest in their tenure and cannot be fired without due process); *see also McKinney v. Univ. of Pittsburgh*, 915 F.3d 956, 960–61 (3d Cir. 2019) ("the Court has recognized a property interest in continued employment where tenured faculty have been expressly informed that they may be terminated only for cause") (internal quotations omitted).  Therefore, if Dr. Krug held a tenured position at BU, his property interest is a clearly established right. However, this due process claim is replete with factual disputes, beginning with whether or not Dr. Krug was actually granted tenure.  Additionally, the events surrounding Dr. Krug's PDC and whether he was truly given due process by a neutral decisionmaker are replete with factual disputes.

Without even being able to determine whether Dr. Krug was an at-will employee or a tenured employee with a property interest in continued employment, as well as numerous other factual disputes, the court is unable to determine whether his due process right was violated by the individual Defendants.  Because factual disputes preclude a finding that Defendants are entitled to summary judgment on this claim on the basis of qualified immunity, Defendants' summary judgment motion is denied in this respect.

### iii. Due Process – Reputation

The last constitutional claim at issue is Dr. Krug's due process claim premised on his reputation as a liberty interest.  Here, Defendants' only argument is that Dr. Krug cannot sufficiently satisfy the "stigma-plus" test in order to succeed on his due process claim.  In fact, Defendants concede that individuals have a protectable interest in their reputation.  (Doc. 90, p. 33.)  Thus, the constitutional right at issue on this claim is clearly established.  The question of whether the individual Defendants' conduct violated that right is one that cannot be resolved on a motion for summary judgment, as several factual disputes exist surrounding Dr. Krug's PDC and whether he was truly given due process by a neutral decisionmaker.  These factual disputes are more properly left to a jury.  Therefore, Defendants' summary judgment motion is denied to the extent that the individual Defendants seek summary judgment on Dr. Krug's due process claim relating to his reputation on the basis of qualified immunity.

### B. Defendants' Motion for Summary Judgment on All Claims

Defendants moved for summary judgment on all of Dr. Krug's claims.  Dr. Krug's remaining claims can be separated into two main categories: due process claims and retaliation claims.  Though the retaliation claims are brought for different instances of speech and under different statutes, the analysis is almost identical.  On the retaliation claims, Defendants argue that they are entitled to

summary judgment because Dr. Krug cannot prove a causal connection between protected activities and termination.  On the due process claims, Defendants argue that Dr. Krug did not have a property interest in continued employment and that they did not damage his reputation.

The court has carefully reviewed the voluminous filings of the parties and finds that there are numerous disputes of material facts on these claims in this case and Defendants are therefore not entitled to summary judgment.

### C. Dr. Krug's Motion for Summary Judgment on Due Process Claims

Dr. Krug moved for summary judgment only on the due process claims in this case.  Dr. Krug argues that the entire investigation and PDC were a sham, that Krause was not a neutral decisionmaker, and that his termination was pre-decided. Again, having carefully reviewed the voluminous filings of the parties, the court finds that there are numerous disputes of material facts on the due process claims in this case and Plaintiff is therefore not entitled to summary judgment.

CONCLUSION

For the reasons stated herein, the court will deny Plaintiff's motion for partial summary judgment, Doc. 79, as well as Defendants' motion for summary judgment, Doc. 88.  An appropriate order will issue.


s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

Dated: February 13, 2023