## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JEFFREY KRUG, | : | Civil No. 4:18-CV-1669 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| BLOOMSBURG UNIVERSITY, *et al.*, | : | |
| | : | |
| Defendants. | : | Judge Jennifer P. Wilson |

### MEMORANDUM

Before the court is the motion for judgment as a matter of law and new trial, filed by Defendants Bloomsburg University ("Bloomsburg"), Pennsylvania State System of Higher Education ("PASSHE"), Dr. Bashar Hanna ("Dr. Hanna") and Dr. James Krause ("Dr. Krause") (collectively, "Defendants"). (Doc. 191.)  In the amended complaint, Dr. Krug alleged his employment was terminated in retaliation for assisting Bloomsburg University's President Dr. Hanna's executive assistant in making allegations of sexual harassment and financial misconduct against Dr. Hanna, in violation of multiple federal and state statutes.[1]  (Doc. 54.) After a seven-day jury trial, the jury returned a verdict in favor of Dr. Krug on each claim, awarding him $1,008,549 in back pay, $775,589 in front pay, $1,500,000 in

---

[1] Dr. Krug alleged Title IX retaliation claims, Title VII retaliation claims, § 1983 First Amendment retaliation and deprivation of procedural due process claims, as well as Pennsylvania Whistleblower Law claims and retaliation claims under the Pennsylvania Human Resources Act ("PHRA") against Defendants stemming from his termination as Dean of the Business School at Bloomsburg University.  (Doc. 54.)  Dr. Krug also alleged retaliation for filing complaints of retaliation against him.  (*Id.*)

compensatory damages, and $450,000 in punitive damages against Dr. Hanna and $200,000 in punitive damages against Dr. Krause.  (Doc. 176.)  Defendants now move for judgment as a matter of law and for a new trial under Federal Rules of Civil Procedure 50(b) and 59.  (Doc. 191.)  For the reasons that follow, Defendants' motion for judgment as a matter of law and new trial will be denied.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY[2]

Dr. Krug initiated this case via complaint on August 22, 2018.  (Doc. 1.) Defendants answered that complaint on October 22, 2018.  (Doc. 10.)  Dr. Krug filed the operative amended complaint on July 8, 2019, which Defendants answered on July 18, 2019.  (Docs. 54, 57.)  The parties' filed cross-motions for summary judgment in March and May 2022, respectively.  (Docs. 79, 88.)  The court denied both motions on February 13, 2023, and after a telephone conference with the parties on February 16, 2023, this case was listed for a date certain trial. (Docs. 114, 117.)  The trial date was continued once, and ultimately commenced on August 12, 2024.  (Doc. 123.)

Dr. Krug proceeded to trial on ten claims against the Defendants: 1) § 1983 First Amendment retaliation against Drs. Hanna and Krause; 2) § 1983 Fourteenth Amendment procedural due process deprivation of a property interest in

---

[2] In this factual background section, the court has included only the facts elicited at trial that are implicated by the parties' arguments in the instant motion or necessary to provide sufficient context.

employment against Drs. Hanna and Krause; 3) § 1983 deprivation of liberty interest in reputation against Drs. Hanna and Krause; 4) Title VII retaliation for reporting sexual harassment against Bloomsburg University and PASSHE; 5) Title VII retaliation for complaining of retaliation against Bloomsburg University and PASSHE; 6) Title IX retaliation for reporting sexual harassment against Bloomsburg University and PASSHE; 7) Title IX retaliation for complaining of retaliation against Bloomsburg University and PASSHE; 8) PHRA retaliation for assisting in reporting sexual harassment against Bloomsburg University, PASSHE, Dr. Hanna, and Dr. Krause; 9) PHRA retaliation for complaining of retaliation against Bloomsburg University, PASSHE, Dr. Hanna, and Dr. Krause; and 10) violation of the Pennsylvania Whistleblower Law against Bloomsburg University, PASSHE, Dr. Hanna and Dr. Krause.  Dr. Krug requested compensatory damages, front pay, back pay, and punitive damages.

### A. Pre-Trial Motions

Prior to the start of trial, Defendants filed three motions *in limine* and Dr. Krug filed one.  (Docs. 126, 128, 130, 148.)  The resolution of one of these motions warrants discussion because it bears on the instant motion.[3]  Defendants

---

[3] The court granted Defendants' motion *in limine* regarding the substance of misconduct allegations against Dr. Hanna, deferred ruling on Defendants' motion *in limine* regarding the involvement of Bloomsburg University, and denied Defendants' motion *in limine* request to file further motions *in limine*.  (Doc. 142.)  The court denied Dr. Krug's motion to find Bloomsburg's discrimination and harassment policy unconstitutional.  (Doc. 156.)

filed a motion *in limine* to exclude the substance of the allegations against Dr. Hanna, arguing that permitting Dr. Krug to explore the substance of the sexual harassment allegations against Dr. Hanna did not have a proper purpose under Federal Rule of Evidence 404(b), and any probative value would be outweighed by prejudice, under Rule 403. (Doc. 127.) Dr. Krug opposed this request, arguing that the evidence was admissible as part of the *res gestae* of the case and the evidence is "part and parcel" of the underlying allegations. (Doc. 132.)

Initially, the court granted the motion *in limine* and held that Dr. Krug was only permitted "to tell the jury how an allegation of misconduct regarding Dr. Hanna was made, and the steps that were taken after the report of misconduct was made. However, the specific details of the allegation of misconduct will be precluded because those details would be unfairly prejudicial to Defendant Hanna[.]" (Doc. 142.) After the court entered this order, Plaintiff's counsel requested "clarification" of the order, and both parties and the court discussed the order on a telephonic status conference. (Doc. 146, 147.) During the status conference, Plaintiff's counsel asked whether he could reference that the allegations dealt with sexual harassment and discrimination, generally. (Doc. 155.)[4] Defense counsel argued that the idea Plaintiff could not meet his *prima*

---

[4] The cited document is the minute sheet from the telephone conference. The substance of what was said at the conference is taken from the court's notes as reflected in the minute sheet.

*facie* case without reference to the type of allegations is false, and any reference to

sexual harassment or discrimination is unduly prejudicial and irrelevant.  (*Id.*)

After this input from both parties, the court clarified its previous order and held

that "the parties may elicit the fact that the alleged misconduct was in the form of

sexual harassment or discrimination and financial wrongdoing or waste.  The

parties may <u>not</u> elicit testimony regarding the specific actions that give rise to these

allegations." (Doc. 158.)

      With these evidentiary rulings in mind, Plaintiff's counsel limited discussion

of the underlying allegations in his opening statement, specifically stating:

> Let me tell you what happened.  The first witness you're going to hear
> from, her name is Angela Crossley.  Ms. Crossley was a secretary or
> executive assistant to Dr. Hanna, and she was being sexually harassed.
>
> Now, I'm not going to and none of us are going to talk about what that
> sexual harassment entailed because this is not her case against Dr.
> Hanna.  There is no case.  That's not the issue.  And that would not
> really be fair to him in this retaliation case.  All you need know is, she
> complained he's sexually harassing me.  She didn't know what to do.
> He is a very big deal, and she didn't know what to do.

(Doc. 196, p. 161.)  Then, despite the court's ruling and Plaintiff's counsel's

opening statement, Defendants' counsel began to discuss the substance of the

allegations against Dr. Hanna during the defense opening.  Plaintiff's counsel

immediately objected.  (*Id.* at 79, 80.)  At sidebar, the court warned Defendants'

counsel that, "if you present this information to the jury, you are now injecting the

issue into the case.  It will be a factual dispute that plaintiff can present evidence

on. Is that what your intention is?" and Defendants' counsel confirmed that was their intention. (*Id.* at 81.) Plaintiff's counsel then requested a rebuttal opening statement, since Plaintiff had not discussed the facts of the underlying sexual harassment in his opening based on the court's *in limine* ruling, and the court granted the request. (*Id.*)

### B. Plaintiff's Evidence

Plaintiff began his case by presenting the testimony of Angela Crossley. Ms. Crossley testified that she was the administrative assistant to the president of Bloomsburg University; both Dr. Hanna and his predecessor. (*Id.* at 91.) Ms. Crossley testified that, after Dr. Hanna began his tenure as president, while performing her duties, she noticed financial red flags by Dr. Hanna such as submitting receipts twice and inappropriate uses of discretionary funds. (*Id.* at 95, 96.) Ms. Crossley then detailed some of Dr. Hanna's behavior towards her, including, what she felt was inappropriate use of terms of endearment, rubbing her shin with his foot when they were sitting in proximity to one another, rubbing her arm or shoulder while they were talking, kissing her on the cheek when leaving a group event. She also described one incident when she was crying in Dr. Hanna's office, and then he embraced her, kissed her forehead, and stated something along the lines of "you remind me of my sisters when you cry." (*Id.* at 97–104.)

Crossley also testified that she spoke to Bloomsburg University Trustee Robert Dampman about Dr. Hanna's behavior towards her. Eventually, after receiving the advice of her friend Judy Rostucher, who worked for Dr. Krug, she also spoke with Dr. Krug about her concerns. (*Id.* at 108–14.) Crossley testified that she went with Dr. Krug and Judy Rostucher to report the alleged sexual harassment to Bloomsburg University's Title IX office, where she was met with indifference. (*Id.* at 114–19.) Ms. Crossley testified that she met with investigators from PASSHE regarding the allegations in public at a Panera Bread and in the back of a van. (*Id.* at 120–25.)

Plaintiff next presented the testimony of Judy Rostucher, Ms. Crossley's friend, who worked with Dr. Krug, and who helped Ms. Crossley connect with Dr. Krug, went with Crossley and Dr. Krug to report to the Title IX office, and accompanied Crossley when she was interviewed by PASSHE investigators. (*Id.* at 133–140.) Rostucher also testified to perceived retaliation she experienced after helping Crossley report her allegations, including rumors of a romantic affair spread about Rostucher and Dr. Krug and email irregularities. (*Id.* at 141–59.) Rostucher testified about an investigative report into this situation which misrepresented her interview. Specifically, Rostucher testified that her union representative "flew into a rage" upon seeing the final report because "she [Rostucher] never said any of this stuff." (*Id.* at 165.)

Dr. Krug called Dr. Robert Dampman to testify that Angela Crossley contacted him to discuss her allegations of sexual harassment against Dr. Hanna around the end of October 2017. Dr. Dampman attempted to discuss these allegations at Trustee meetings, but felt stonewalled. (Doc. 197, pp. 14–18, 23–25.)

Next, Dr. Krug called Dr. Hanna as on cross. Dr. Hanna began by outlining his career and testifying about a previous complaint against him while employed at Kutztown University, and his ultimate separation from that University. (*Id.* at 39–46.) Dr. Hanna also testified to recognizing an anonymous email which was sent to Bloomsburg University from Delaware Valley University while Dr. Hanna was applying for the president position at Bloomsburg, which referenced Dr. Hanna's behaviors towards women. (*Id.* at 63.) This email was admitted over Defendants' objection for the specific purpose of proving PASSHE's knowledge as to the allegations contained in the email. (*Id.* at 66–70; 75, 76.)

Dr. Hanna testified to a letter he sent Dr. Krug on March 9, 2018, stating that Dr. Krug was an at-will employee. Dr. Hanna testified that he did not know that March 9, 2018 was the same date that Dr. Krug attended a pre-disciplinary conference ("PDC") with Dr. Krause to address Dr. Krug's disclosures of Ms. Crossley's complaint. (*Id.* at 95–98.) Dr. Hanna testified that PASSHE initiated moving Angela Crossley to different employment after she made allegations

8

against him. (*Id.* at 101–05.) Dr. Hanna testified that Suzanne Williamson conferred with Dr. Krause prior to Dr. Krug's PDC, and Ms. Williamson also participated in Dr. Hanna's PDC. (*Id.* at 106, 111.) Dr. Hanna testified that, after his PDC with the Chancellor of PASSHE, where he was provided the opportunity to have counsel and the opportunity to respond to the investigative report against him, the Chancellor adopted the conclusions of the report that there had been "no financial wrongdoing, no hostile work environment, no retaliation, and no sexual harassment." (*Id.* at 133, 134.)

Dr. Alan Krug also testified on behalf of his son, Dr. Jeffrey Krug. Dr. Alan Krug testified to his career background as a lobbyist, and one conversation with his son in which Dr. Jeffrey Krug told Alan Krug about a sexual harassment allegation from a friend of Jeffrey Krug's assistant, Judy Rostucher. (*Id.* at 148–53.) Dr. Alan Krug also testified how he informed two state legislators who were on the PASSHE board about the allegations against Dr. Hanna. (*Id.* at 153, 54.) Dr. Jeffrey Krug's sister, Angela Johnston, also testified as to her experience with Title IX enforcement, her experiences in discussing Angela Crossley's allegations with Dr. Krug and Ms. Crossley herself on a separate occasion, and the advice that Angela Johnston gave to her brother regarding the necessity that he report Ms. Crossley's allegations to the appropriate authorities. (*Id.* at 174–93.)

Dr. Jeffrey Krug testified on his own behalf.  He testified as to his professional background and how he came to work at Bloomsburg University.  (*Id.* at 193–221.)  Dr. Krug also testified as to the pre-disciplinary conference ("PDC") that occurred with Dr. Krause, PASSHE employee Lisa Sanno, and a Bloomsburg HR representative on March 9, 2018.  (*Id.* at 221–23.)  The night before the PDC, Dr. Krug was inadvertently emailed the entirety of an independent investigation undertaken by the law firm Ballard Spahr.  (*Id.* at 224.)  Dr. Krug also testified to his meetings with Dr. Wislock, the Title IX coordinator, Angela Crossley, and Judy Rostucher.  (*Id.* at 235–50.)

Dr. Krug testified regarding retaliation that he experienced after assisting Ms. Crossley report her allegations, such as an administrative assistant who was moved into Dr. Krug's office by Dr. Krause rifling through Dr. Krug's belongings and computer, files going missing, emails being read remotely, and rumors spread about him and Ms. Rostucher.  (*Id.* at 250-51, 259.)  Dr. Krug and Ms. Rostucher filed Title IX complaints regarding this alleged retaliation.  (*Id.* at 262.)

Dr. Krug detailed his objection to Dr. Krause conducting the PDC, including the fact that Dr. Krug had lodged complaints of retaliation against Dr. Krause, and Dr. Krause's statement at the PDC that Dr. Hanna had appointed Krause to be the "arbiter" of Dr. Krug's fate.  (Doc. 198, p. 29.)  Dr. Krug testified as to emails between Dr. Krause and PASSHE legal counsel Suzanne Williamson, which

drafted Dr. Krug's termination letter and an announcement regarding the termination of Krug's employment as Dean the day before Krug's PDC. (*Id.* at 37–39.) Dr. Krug testified to the lack of information given to him before and during the PDC, the fact that he was not allowed to have counsel at the meeting, his attempts to provide his responses to the allegations against him, and PASSHE's response that the choice of Dr. Krause was at the President of Bloomsburg's statutory discretion, which PASSHE had no authority to disturb. (*Id.* at 39–52.)

Dr. Krug testified that his employment was terminated on March 21, 2018, after Dr. Krause and HR director Jerry Reed personally delivered a letter to Dr. Krug in his office and escorted him off campus. (*Id.* at 52.) The given reason for the termination was violation of confidentiality and exposing a student record in violation of FERPA. (*Id.*)

Dr. Krug testified about his emotional pain over this situation as well as the difficulties he had in finding comparable employment after the termination of his employment, due to a statement issued by Bloomsburg University that Dr. Krug had violated student confidentiality. (*Id.* at 52–81.)

In a break in Dr. Krug's testimony, Defendants attempted to admit the Ballard Spahr investigative report into evidence. Defendants presented the testimony of Suzanne Williamson, who is currently the vice president of administration and chief of staff at Commonwealth University, which includes

11

campuses at Bloomsburg, Mansfield, and Lock Haven.  (*Id.* at 116.)  Williamson

testified that any documents maintained by Bloomsburg University prior to

merging with other Pennsylvania universities and becoming Commonwealth

University would be in the possession of Commonwealth University, as the

statutory successor of Bloomsburg University.  (*Id.* at 117.)  Williamson testified

that she is the *de facto* keeper of records for Commonwealth University,

Bloomsburg.  (*Id.* at 117, 119.)  She testified that the report at issue was generated

by an outside third party–Ballard Spahr–and was the report of an investigation

regarding the disclosure of confidential information by Dr. Jeffrey Krug and Judy

Rostucher.  (*Id.* at 119.)  Williamson testified that it was normal and common in

the course of business for Bloomsburg University to maintain documents prepared

by external parties.  (*Id.*)  Williamson testified that Ballard Spahr prepared three

different reports for this investigation, and Ballard Spahr was retained to provide

these investigation reports.  (*Id.* at 122.)  Williamson testified that she did not

believe Ballard Spahr recorded the interviews in any way.  (*Id.* at 123.)

   After Williamson's testimony, the court did not admit the Ballard Spahr

report for multiple reasons.  First, the court did not admit the report because

Williamson was not an appropriate custodian of records, given that she was not

employed at Bloomsburg University at the time the report was prepared, and she

could not testify to the foundational requirements of Federal Rule of Evidence

803(6). (*Id.* at 129.) The court also noted that the report was not prepared by Bloomsburg employees, but by an outside law firm. (*Id.*) The court additionally excluded the document because the preparers of the document did not have personal knowledge of the matters in the report, and it was not established that it was a regular practice of Bloomsburg to have investigative reports prepared by outside firms. (*Id.*) The court also held that the document was prepared for the purpose of an investigation and litigation of a personnel issue. (*Id.* at 130.) Finally, the court noted that the credibility of the report had already been placed at issue by testimony thus far at trial, as well as the issue of the report containing hearsay within hearsay, for which there would need to be independent exceptions to admit certain statements. (*Id.*)

Mr. John Braganini testified via recorded deposition testimony. (*Id.* at 198.) Mr. Braganini testified that information contained in the Ballard Spahr report regarding his willingness to give a gift was inaccurate. (Doc. 136-1, p. 8.) The Ballard Spahr report relayed that Mr. Braganini decided not to give a gift after hearing what occurred with Dr. Krug and Dr. Hanna. However, Braganini testified that he actually never intended to give the gift that was solicited and, at that time, he had not heard about what was happening with Dr. Krug and Dr. Hanna. (*Id.*)

Mr. Andrew Lehman, former chief counsel for PASSHE, testified that, after a PASSHE investigation, it was recommended that the individuals who spread

rumors regarding Dr. Krug and Judy Rostucher should have pre-disciplinary conferences. (Doc. 198, p. 206.) Mr. Lehman was also the person responsible for hiring Ballard Spahr to investigate whether Dr. Krug had breached confidentiality rules in discussing Ms. Crossley's sexual harassment allegation. (*Id.* at 216.) Lehman described the process of how he did so, and he directed Ballard Spahr to only investigate speech that was not a matter of public concern. (*Id.* at 219.) Lehman also testified that Dr. Hanna had been walled off from Dr. Krug's disciplinary proceedings and that Dr. Krause was chosen because he was next in line, despite the presence of disagreements or "allegations of bias" against Dr. Krause. (*Id.* at 224.) Dr. Lehman testified that Dr. Hanna was advised to recuse himself from this investigation and appoint another administrator to handle it. (*Id.* at 227.) Dr. Lehman testified that it was not common or an acceptable practice within PASSHE to draft a termination letter in advance of a PDC. (Doc. 199, p. 19.) Lehman also testified that it was not a common or acceptable practice to pre-draft letters to university constituencies regarding Dr. Krug's employment termination prior to the PDC. (*Id.* at 22, 23.)

Mr. Andrew Verzilli, qualified as an expert in economics, testified as to the back pay and front pay to which Dr. Krug was entitled, totaling $1,800,549 in back pay and $1,453,852 in front pay. (*Id.* at 40–56.)

Ms. Suzanne Williamson testified that she assisted Dr. Krause in drafting Dr. Krug's termination letter prior to the PDC, as well as reviewing the email to four university constituencies. (*Id.* at 72–74.) Williamson also testified that it is an acceptable practice to start drafting discipline letters following receipt of an investigation report. (*Id.* at 72.) Mr. Jerry Reed, who was then the director of human resources, testified that he had prepared the letter of termination for Dr. Krug with input from PASSHE. (*Id.* at 118.)

Dr. James Krause testified next. Dr. Krause testified that he became aware of Angela Crossley, in his opinion, gossiping about Dr. Hanna, and he thought that was inappropriate. (*Id.* at 190.) Dr. Krause testified that Dr. Hanna appointed Dr. Krause to be the arbiter of Dr. Krug's case. (*Id.* at 194.) Krause also testified that he reviewed the report with attorneys from Ballard Spahr. (*Id.* at 223.) Dr. Krause testified he was working with Suzanne Williamson and PASSHE, and PASSHE was the entity that instructed him to provide only a summary report to Dr. Krug. (*Id.* at 236.) Dr. Krause testified that he spoke with potential replacements for Dr. Krug as early as March 8. (Doc. 200, p. 22.) Krause testified that he relied on the facts set forth in the Ballard Spahr report as well as Dr. Krug's verbal testimony and written responses. (*Id.* at 12.) Dr. Krause testified that he notified Dr. Hanna on the morning of March 21, 2018, that Krause has decided to terminate Dr. Krug's employment. (*Id.* at 27.) After Dr. Krause's testimony, Plaintiff rested.

**C. Defendants' Evidence**

As part of Defendants' case in chief, Dr. Hanna testified to his version of what happened with Ms. Crossley.  (Doc. 200, p. 46.)  Dr. Hanna testified that when Ms. Crossley was crying in his office, he sat next to her, placed his hand on her shoulder, kissed her, and said she reminded him of one of his sisters.  (*Id.*)  Dr. Hanna testified that he was made aware of allegations made against him by Ms. Crossley on or about November 15, 2017, by PASSHE counsel Andrew Lehman.  (*Id.* at 54.)  It was at this time that Mr. Lehman advised that PASSHE would handle the situation, and that Dr. Hanna was not to do anything about it.  (*Id.*)  Ms. Crossley was immediately transferred out of Dr. Hanna's office, and he rarely saw her afterward.  (*Id.* at 55.)  Dr. Hanna testified to the PDC he went through regarding Ms. Crossley's allegations and how he was allowed an attorney to respond to the report and an attorney was present during the meeting.  (*Id.* at 57.)  Dr. Hanna testified that he became aware of potential confidential disclosures sometime around the New Year in 2018 after Mr. Lehman called him and asked him to deputize someone to investigate the disclosures.  (*Id.* at 61, 62.)

As part of Defendants' case in chief, Dr. Krause testified again, beginning with the contours of his relationship with Dr. Krug prior to the incidents at issue in this case.  Mainly, Dr. Krause testified to disagreements between himself and Dr. Krug relating to vacation requests, appointment of an interim dean in the business

16

school, and minor failures to comply with Dr. Krause's administrative requests.
(*Id.* at 105–23.)  Dr. Krause then testified that Mr. Lehman informed him of the
investigation into confidential disclosures, and that Dr. Hanna was going to appoint
Dr. Krause to be the arbiter of the situation, but that it must not be discussed with
Dr. Hanna.  (*Id.* at 128.)  At this point, the Ballard Spahr report was admitted, over
Dr. Krug's objection, for the limited purpose of showing the information Dr.
Krause relied on when deciding the disciplinary matter regarding Dr. Krug, not for
the truth of the contents of the report.  (*Id.* at 133–37.)  Dr. Krause then testified to
the contents of the Ballard Spahr report, including the identified disclosures and
the conclusions reached by the Ballard Spahr attorneys as to whether those
disclosures were appropriate.  (*Id.* at 141–47.)

Dr. Krause testified that at the PDC, Dr. Krug addressed things outside of
the Ballard Spahr report, was rambling, contradictory, and blamed things on others.
(*Id.* at 151–61.)  During cross-examination of Dr. Krause, Dr. Krug's counsel
asked about the inconsistencies between the Ballard Spahr report and the evidence
elicited at trial, including Ballard Spahr not interviewing key witnesses, differences
between witnesses' testimony, and inaccuracies in witnesses' testimony.  (*Id.* at
167–83.)  Dr. Krause testified that he believed the Ballard Spahr report had all the
information he needed to make the decision, despite the lack of interviews from
Dr. Alan Krug, Angela Johnston, JoAnn Zeigler, and Angela Crossley.  (*Id.* at

17

199.)  Dr. Krause testified that he drafted a disciplinary letter that summarized the key parts of the Ballard Spahr report the day before the PDC, but that the letter did not contain any conclusions as to appropriate discipline.  (*Id.* at 209–10.)

Defendants' final witness was Dr. Robert Wislock, the Director of Accommodations for Students with Disabilities and Equity.  (*Id.* at 226.)  Dr. Wislock testified that he discussed confidentiality with Dr. Krug, Judy Rostucher, and Angela Crossley when they met with him, although all three of those individuals testified that he did not do so.  (*Id.* at 255.)

### D. Rule 50 Motions

At the close of evidence, but prior to submitting the matter to the jury, Defendants moved for dismissal of PASSHE based on there being no evidence showing personal involvement of PASSHE.  (Doc. 201, p. 8.)  Defendants contend there was only evidence showing that PASSHE gave legal advice to its client.  (*Id.*)  Defendants also moved for dismissal of Dr. Hanna based on lack of evidence of personal involvement because the evidence presented was only conjecture and speculation that Dr. Hanna was involved.  (*Id.* at 9.)  Defendants moved for dismissal of the whistleblower claim because, based on *McClain v. Mann*, 2008 WL 975059, and Defendants' contention that bringing a whistleblower complaint to someone who is not the appropriate authority causes a whistleblower claim to fail.  (*Id.*)  Defendants further argued that it was not established that Dr. Krug

18

raised the financial wrongdoing allegation to the appropriate authority. (*Id.* at 10.) Defendants argued that conspiracy as a theory of liability is insufficient when the individuals involved in the conspiracy are members of the same agency, here, Dr. Hanna and Dr. Krause, relying on *Piazza v. Young*, 403 F.Supp. 3d 421, 440 (M.D. Pa. 2019). (*Id.* at 10, 11.) Regarding the constitutionality of the Bloomsburg discrimination policy, Defendants argued that, "even if the policy were to be declared unconstitutional now six years after the fact, that would essentially be giving the Defendants qualified immunity on that issue because they followed the policy that was legal at the time." (*Id.* at 20, 21.)

Dr. Krug responded that PASSHE was involved because Suzanne Williamson, PASSHE's employee, participated in drafting the termination letter and statement with Dr. Krause, PASSHE retained Ballard Spahr to investigate and write a report, and, Ballard Spahr, as PASSHE's agent, made conscious choices of who to interview and who not to interview, and that PASSHE directed Dr. Hanna to appoint Dr. Krause. (*Id.* at 11, 12.) Dr. Krug further responded that Dr. Hanna was personally involved because he appointed Krause, and also pointed to the suspect timing between the March 9 PDC and the letter stating Dr. Krug was an at-will employee, the suspect timing of Dr. Krug's termination date being the same date when Dr. Hanna was "exonerated" by PASSHE, and the suspect timing of Dr. Hanna sending the email to the constituencies four minutes after receiving word

that Dr. Krug was terminated.  (*Id.* at 12, 13.)  Dr. Krug also responded that telling other people does not negate a whistleblower claim when the appropriate authority is also told, and Dr. Wislock was the appropriate authority for the financial wrongdoing allegation, as well as the PASSHE investigators that Dr. Krug told. (*Id.* at 13, 14.)  Finally, Plaintiff responded that PASSHE and Bloomsburg University are not the same entity and there could be a conspiracy between employees of the two organizations.  (*Id.* at 14.)

The court denied Defendants' motion without prejudice and with leave to renew after the verdict.  (*Id.* at 16.)  Regarding the argument about conspiracy, the court held there was no standalone conspiracy claim to dismiss, and the issue of conspiracy would be discussed further at the charge conference.  (*Id.*)

Dr. Krug also made a Rule 50 motion, which was also denied without prejudice with leave to renew the motion after the verdict.  (*Id.* at 17–19.)  Dr. Krug did not file a renewed motion, and thus, the court will not outline the Rule 50 arguments here.

After closing arguments and jury instructions, which have not been challenged here, the jury returned a verdict in favor of Dr. Krug on all claims, and awarded him back pay, front pay, compensatory, and punitive damages.  (Doc. 176.)  The court affirmed the jury's advisory verdict regarding back pay and front pay, and the clerk entered judgment on August 21, 2024.  (Docs. 181, 182.)

Thereafter, on August 30, 2024, Plaintiff filed a motion to alter judgment and a motion for attorney's fees. (Docs. 183, 185.) The briefing for the motion for attorney's fees was stayed pending the resolution of anticipated motions for judgment as a matter of law and new trial. (Doc. 190.) Thereafter, Defendants filed the instant motions. (Doc. 191.) The motions have been fully briefed and are ripe for disposition.

JURISDICTION AND VENUE

The court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1343 because Dr. Krug brought claims under federal statutes, namely 42 U.S.C. § 1983, 20 U.S.C. § 1681(a), and 42 U.S.C. § 2000e. The court has supplemental jurisdiction over the Pennsylvania Whistleblower Law and PHRA claims under 28 U.S.C. § 1367 because they are related to the federal claims. Venue is proper in the Middle District of Pennsylvania under 28 U.S.C. § 1391(b) because all acts or omissions giving rise to the claim occurred with the Middle District.

STANDARDS OF REVIEW

## A. Rule 50(b)–Renewed Motion for Judgment as a Matter of Law

Federal Rule of Civil Procedure 50(b) provides: "If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion." In ruling on a motion under

Rule 50(b), the court may "allow judgment on the verdict," "order a new trial," or "direct the entry of judgment as a matter of law." FED. R. CIV. P. 50(b)(1)–(3).

A court should "sparingly" enter judgment as a matter of law and, "only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *Marra v. Phila. Housing Auth.*, 497 F.3d 286, 300 (3d Cir. 2007) (quoting *CGB Occupational Therapy, Inc. v. RHA Health Servs. Inc.*, 357 F.3d 375, 383 (3d Cir. 2004); and *Moyer v. United Dominion Indus., Inc.*, 473 F.3d 532, 545 n.8 (3d Cir. 2007)). The court must "refrain from weighing the evidence, determining the credibility of witnesses, or substituting [its] own version of the facts for that of the jury." *Id.* (citing *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993)).

### B. Rule 59–Motion for a New Trial

Federal Rule of Civil Procedure 59(a)(1)(A) provides: "[t]he court may, on motion, grant a new trial on all or some of the issues–and to any party–as follows: after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]" FED. R. CIV. P. 59(a)(1)(A).

The decision to grant a new trial is "confided almost entirely to the exercise of discretion on the part of the trial court." *Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980). The scope of that discretion is determined by reference to

the basis for the motion.  If the motion is made on the basis of an evidentiary ruling or prejudicial statements by counsel, the district court has broad discretion on whether to grant or deny the motion and disturb the jury's verdict.  *Klein v. Hollings*, 922 F.2d 1285, 1289–90 (3d Cir. 1993).  "Admission of evidence is an abuse of discretion if 'the district court's action was arbitrary, fanciful or clearly unreasonable[.]"  *Ansell v. Green Acres Contracting Co., Inc.*, 347 F.3d 515, 519 (3d Cir. 2003).

Conversely, when the motion is based on the weight of the evidence being against the verdict, the district court's discretion is more limited.  *Klein*, 922 F.2d at 1290.  "A new trial should be granted only where the great weight of the evidence cuts against the verdict and 'where a miscarriage of justice would result if the verdict were to stand.'"  *Springer v. Henry*, 435 F.3d 268, 274 (3d Cir. 2006) (quoting *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1076 (3d Cir. 1996)).

Further, Federal Rule of Civil Procedure 61 provides:

> Unless justice requires otherwise, no error in admitting or excluding evidence–or any other error by the court or a party–is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order.  At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights.

FED. R. CIV. P. 61.  Thus, a new trial should only be granted when a party's substantial rights have been affected by an error.  The Third Circuit has held that in

considering evidentiary rulings in a civil suit, a nonconstitutional error is a harmless error "if it is highly probable that the error did not affect the outcome of the case." *Glass v. Philadelphia Elec. Co.*, 34 F.3d 188, 191 (3d Cir. 1994).

DISCUSSION

Defendants move both for judgment as a matter of law and for a new trial. The court will first decide the renewed motion for judgment as a matter of law and then decide the motion for a new trial.

**A. Renewed Motion for Judgment as a Matter of Law**

**1. Personal Involvement of Dr. Hanna**

Defendants argue that Dr. Hanna is entitled to judgment as a matter of law because there was no evidence that he was personally involved in retaliatory conduct regarding the § 1983 claims. (Doc. 205, p. 14.) Specifically, Dr. Hanna argues that there was no evidence that he was personally involved in terminating Dr. Krug's employment or that he directed Dr. Krause to make a certain decision, and the testimony showed that Dr. Hanna was "walled off" from any decision regarding Dr. Krug's employment. (*Id.* at 15–18.)

Conversely, Dr. Krug points to the following trial evidence to support Dr. Hanna's personal involvement in retaliation against Dr. Krug: (1) the timing of Dr. Hanna's letter stating Dr. Krug was at will and Dr. Krug's PDC being on the same day (Doc. 206, p. 15); (2) the timing of the date of the termination of Dr. Krug's

employment and the decision regarding Dr. Hanna's discipline (*Id*); (3) testimony that Dr. Hanna appointed Dr. Krause as arbiter of Dr. Krug's disciplinary matter (*Id*); (4) the testimony and evidence that Dr. Hanna had been waiting for the email regarding the termination of Dr. Krug's employment and sent his own email to key constituencies within four minutes of receiving it (*Id*); (5) and Dr. Hanna's participation in drafting and distributing a public statement regarding Dr. Krug's disclosures after the termination of Dr. Krug's employment (*Id.* at 16).  Dr. Krug relies on the standard for deciding renewed judgments as a matter of law, and notes that "all disputes of fact and inferences must be decided in Dr. Krug's favor as the verdict winner, [and] any evidence to the contrary is irrelevant for purposes of defendants' post-verdict motion."  (*Id.*) (citing *Lightning Lube, Inc.*, 4 F.3d at 1166.).  Plaintiff also points the court to the case *Kengerski v. Harper*, 23-1926, 2024 WL 4432081 (3d Cir. Oct. 7, 2024), in which the Third Circuit upheld a verdict against a prison warden in which there was circumstantial evidence regarding the warden's knowledge.  (Doc. 206, pp. 17, 18.)

In reply, Defendants discount the evidence presented by Plaintiff, arguing that "[t]he concept that a person can both retaliate against an individual while simultaneously giv[ing] that individual a raise does not make logical sense and certainly does not rise to the level of circumstantial evidence of retaliation."  (Doc. 208, p. 3.)  Defendants further argue that the timing of Dr. Hanna emailing the

trustees about the termination of Dr. Krug's employment cannot support a verdict because "the mere fact that he notified the Council of Trustees upon receiving the email, does not demonstrate that he participated in the decision-making process." (*Id.* at 4.)

The court begins by noting that Dr. Hanna is only moving for judgment as a matter of law with respect to the § 1983 claims, as those are the only claims for which Dr. Hanna provides a standard. (Doc. 205, pp. 14, 15.) Accordingly, the court will only consider whether there is the minimum quantum of evidence and will draw all inferences in the light most favorable to the verdict winner to determine whether Dr. Hanna was personally involved in conduct giving rise to the § 1983 claims.

To show that a defendant was personally involved in a constitutional violation under § 1983, there must be a showing of personal direction, "participation in[,] or actual knowledge of and acquiescence in the wrongful conduct." *Rode v. Deallarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988); *Chavarriaga v. N.J. Dep't of Corrs.*, 806 F.3d 210, 222 (3d Cir. 2015). Liability cannot be premised solely on a theory of *respondeat superior. Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005).

As noted by Dr. Krug, the trial evidence showed that Dr. Hanna appointed Dr. Krause to be the "arbiter" of Dr. Krug's employment status. (Doc. 200, p.

194.)  While Dr. Hanna testified that he did not know what he was appointing Dr. Krause for, Dr. Krug also presented the circumstantial evidence regarding the coinciding dates of Dr. Hanna's letter stating Dr. Krug was an at-will employee and Dr. Krug's PDC.  ( Pl's Exhs. 50, 134.)  Additionally, there was evidence that Dr. Hanna was waiting for the email regarding Dr. Krug's termination.  (Pl's Exh. 133.)  The jury presumably adopted Dr. Krug's preferred inference that the timing of these events was not mere coincidence.  For the deprivation of liberty interest claim, Dr. Krug also presented evidence that Dr. Hanna participated in drafting a statement, which was later used against Dr. Krug in unemployment compensation proceedings.  (Pl's Exh. 139.)  The court must adopt all inferences in favor of Dr. Krug as verdict winner.  This evidence, and adopting all inferences in favor of Dr. Krug, is sufficient for the jury to have found that Dr. Hanna was personally involved in the § 1983 First Amendment retaliation and liberty and property interest deprivation claims against Dr. Krug.  Accordingly, the motion is denied.

### 2.  Pennsylvania Whistleblower Law

Defendants argue they are all entitled to judgment as a matter of law on the Pennsylvania Whistleblower claim because "an alleged 'report' made to members of the public or co-workers 'serves as a death knell' to a Whistleblower Act claim[,]" specifically relying on the case *McClain v. Munn*, 2008 WL 975059, at *4 (W.D. Pa. 2008).  (Doc. 205, p. 19.)  Dr. Krug discounts Defendants' reliance

on *McClain* and points to the fact that he helped Ms. Crossley report to

Bloomsburg University's Title IX Office, which was the proper authority as Ms.

Crossley's employer.  (Doc. 206, p. 20.)

> The Pennsylvania Whistleblower Law provides that:

> No employer may discharge, threaten or otherwise discriminate or
> retaliate against an employee regarding the employee's compensation,
> terms, conditions, location or privileges of employment because the
> employee or a person acting on behalf of the employee makes a good
> faith report or is about to report, verbally or in writing, to the employer
> or appropriate authority an instance of wrongdoing or waste by a public
> body or an instance of waste by any other employer as defined in this
> act.

43 P.S. § 1423(a).  Succeeding on a Whistleblower Law claim requires a plaintiff

to "show not only that he filed a good faith report of wrongdoing or waste, [but] he

must also establish by concrete facts or surrounding circumstances that the report

led to the termination of his employment."  *Cipriani v. Lycoming Cnty. Housing

Auth.*, 177 F.Supp.2d 303, 329 (M.D. Pa. 2001).

Defendants' reliance on *McClain* is misplaced.  The court in *McClain* held

that reporting solely to members of the public or co-workers is a "death knell" to a

Whistleblower Act claim.  *Id.* at *4.  In *McClain*, the court, at the motion to

dismiss procedural posture, decided that plaintiff had failed to plead a

Whistleblower Act claim because "McClain does not allege that he reported the

alleged [misconduct] to his supervisor, a superior, or any agent authorized to take

action on behalf of the defendant Township."  *Id.*  Thus,"[p]laintiff's Second

Amended Complaint simply avers that he told 'coworkers' and 'members of the public' about the defendants' alleged internet gambling.  This omission alone serves as a death-knell to his Whistleblower status."  *Id.* at *4.  The conclusion reached by the Western District of Pennsylvania makes sense because failing to plead an element of a case would certainly be a "death knell" to a case.  However, interpreting this holding to mean that reporting to a someone who is not an appropriate authority, while also reporting to an appropriate authority, is unwarranted.

Here, as explained by Dr. Krug and not contested by Defendants, Bloomsburg University is a "public body," making it an "employer" under the Whistleblower Law, and a proper place to make an allegation of waste or wrongdoing.  *Id.* §§ 1422, 1423(a).  Dr. Krug physically went with Angela Crossley to Dr. Wislock's office, the University's Title IX Coordinator in charge of Title IX investigations, to assist her in making a good faith report of Dr. Hanna's alleged sexual harassment.  (Doc. 197, pp. 235–50; Doc. 200, p. 228.) This satisfies the Pennsylvania Whistleblower Law's "employer" or "appropriate authority" requirement.  There has not been case law presented to the court establishing that the fact that Dr. Krug also mentioned the harassment to family members is relevant or fatal to this claim.  Accordingly, the motion is denied.

### 3. Qualified Immunity Regarding Dr. Krause

Defendants argue that Dr. Krause is entitled to qualified immunity regarding the § 1983 claims because he relied on the Ballard Spahr report to reach his decision regarding Dr. Krug's employment, and "it cannot be said that it is 'clearly established' that it would be illegal, or even inappropriate, to do so." (Doc. 205, p. 23.) Defendants argue that there was no evidence to contradict Dr. Krause's reliance on the report, and Plaintiff only "offer[ed] what is essentially a conspiracy theory that this report was a sham, either purposely or out of incompetence or sloth, or perhaps because Defendant Krause used it as an excuse to fire Plaintiff in retaliation for assisting in reporting a sexual harassment claim against the president." (*Id.* at 22, 23.)

Dr. Krug argues that Defendants waived this argument because they failed to raise it in their 50(a) motion, and because it is too vague for consideration. (Doc. 206, pp. 24, 25.) Dr. Krug also argues that Dr. Krause is not entitled to qualified immunity regarding the § 1983 claims because he does not argue the law, but rather, recounts his version of the facts, which the jury rejected. (*Id.* at 26.)

Defendants respond that qualified immunity can be raised at any time, including after the conclusion of trial, and argue that Plaintiff has not been prejudiced by the failure to raise the defense sooner. (Doc. 208, p. 5) (relying on *Sharp v. Johnson*, 669 F.3d 144, 158 (3d Cir. 2012)). Defendants also assert that

their argument is not vague; rather, it is clear that Dr. Krause "relied on a report from a law firm and accepted its conclusions, as he is not an attorney. There is no clearly established law that indicates it is a violation of the law or Dr. Krug's rights–let alone inappropriate–for him to do so." (*Id.* at 6.) Defendants also challenge Plaintiff's "conclusion"[5] that Dr. Krause is only raising this defense regarding the § 1983 claim. Defendants counter "that Defendant Krause accepted the legal conclusions of an outside law firm, and there is no legal consensus that he should not have done so, even if that report was erroneous in some way, either factually or legally." (*Id.* at 6.)

Preliminarily, the court will not decide this issue on the basis of waiver. Both parties appear to be correct: failure to raise an argument in a Rule 50(a) motion forfeits consideration of that argument on a Rule 50(b) motion, but the Third Circuit has also plainly held that an affirmative defense, such as qualified immunity, may be raised for the first time after trial if plaintiff suffers no prejudice. *Williams v. Runyon*, 130 F.3d 568, 571–72 (3d Cir. 1997); *Sharp*, 669

---

[5] Defendants state it "is not entirely clear" why Plaintiff concluded that Dr. Krause only raises qualified immunity regarding claims under § 1983. (Doc. 208, p. 6.) However, it is clear to the court why Plaintiff reached this conclusion: in their opening brief, Defendants only make arguments regarding the § 1983 claims. (Doc. 205, p. 21.) ("In this case, constitutional claims were brought against Defendant Krause pursuant to § 1983.") In their motion, Defendants did move for judgment as a matter of law in favor of Defendant Krause on all claims, however, Defendants failed to address all claims in their brief. Accordingly, because Defendant specifically addresses the § 1983 claims, the court will only examine qualified immunity in the context of those claims.

F.3d at 158; *see also Eddy v. Virgin Islands Water & Power Auth*., 256 F.3d 204, 209 (3d Cir. 2001). Neither party has presented case law exactly on point with the factual circumstances of this case,[6] and the court's independent research has failed to produce any. Thus, in the absence of binding precedent squarely on point, the court will not resolve this issue on the basis of waiver, but will address the merits.

The doctrine of qualified immunity recognizes that despite their participation in constitutionally impermissible conduct, government officials "may nevertheless be shielded from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow*, 457 U.S. at 818). The doctrine "protects all but the plainly incompetent or

---

[6] The court notes that the procedural facts of *Sharp* are different than the procedural facts here. The defendants in *Sharp* properly pleaded the affirmative defense of qualified immunity, failed to raise it at summary judgment, and then raised it again at trial. *Sharp*, 669 F.3d at 158–59. The Third Circuit held, on those procedural facts, that defendants had not waived the affirmative defense. *Id.* ("Here, Defendants, who pled qualified immunity as an affirmative defense, placed Sharp on notice of their intent to raise that defense at trial.") The situation in this case is different. Defendants properly pleaded the defense in their answer and also argued the issue on summary judgment, but failed to raise it at any time during the trial, including during their Rule 50(a) motion. Thus, Defendants did not raise this issue at trial, as the defendants in *Sharp* did.

those who knowingly violate the law." *Kisela v. Hughes*, 584 U.S. 100, 104

(2018) (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)).  A defendant asserting

that he is entitled to qualified immunity has the burden to prove that the doctrine

applies.  *Halsey v. Pfeiffer*, 750 F.3d 273, 288 (3d Cir. 2014).

Courts follow a two-pronged test to determine whether qualified immunity

applies.  *Pearson*, 555 U.S. at 232.  The court may exercise its discretion in

deciding "which of the two prongs of the qualified immunity analysis should be

addressed first in light of the circumstances in the particular case at hand."

*Pearson*, 555 U.S. at 236.  First, the court must determine whether the defendants

violated the plaintiff's statutory or constitutional right.  *District of Columbia v.*

*Wesby*, 583 U.S. 48, 63 (2018) (citing *Reichle v. Howards*, 566 U.S. 658, 664

(2012)).  Although Defendants do not address this element at all, the jury has

decided that Defendant Krause violated Dr. Krug's First Amendment right to be

free from retaliation for his speech as well as Dr. Krug's Fourteenth Amendment

due process property right in his employment and his liberty interest in his

reputation.  (Doc. 176.)

Second, the court must determine whether the right at issue was clearly

established at the time of the violation.  *Id.* (citing *Reichle*, 566 U.S. at 664).  "A

right is 'clearly established' . . . only if 'the contours of the right' are 'sufficiently

clear that a reasonable official would understand that what he is doing violates that

right.'" *Larsen v. Senate of Commw. of Pa.*, 154 F.3d 82, 87 (3d Cir. 1998)

(quoting *Anderson v. Creighton*, 483 U.S. 635, 650 (1982)).  Defining the contours

of the right requires a high degree of specificity, and "[a] rule is too general if the

unlawfulness of the [official's] conduct 'does not follow immediately from the

conclusion that [the rule] was firmly established.'"  *Wesby*, 583 U.S. at 63 (quoting

*Anderson*, 483 U.S. at 641.)  Thus, "so long as an official reasonably believes that

his conduct complies with the law, qualified immunity will shield that official from

liability."  *Adamo v. Dillon*, 900 F. Supp. 2d 499, 509 (M.D. Pa. 2012), *aff'd*, 539

F. App'x 51 (3d Cir. 2013).

Defendants do not make any argument regarding how clearly Dr. Krug's

rights were defined at the time when Dr. Krause decided to terminate Dr. Krug's

employment.  Defendants do not even specify whether they are discussing Dr.

Krug's First Amendment or Fourteenth Amendment rights.  Defendants focus

instead on Dr. Krause's right to rely on an investigative report.  (Doc. 205, pp. 22,

23; Doc. 208, p. 6.)  This does not carry their burden of showing that Dr. Krug's

rights were not clearly established at the time of the constitutional violation such

that a reasonable official would not understand that what he was doing violated the

right.

In making the argument that Dr. Krug's rights were not clearly established

because, in the situation faced by Dr. Krause, a reasonable official would rely on

the investigative report, Defendants do not cite any case law in support of this position. The court has found analogous case law in which the Third Circuit held that "a police officer who relies in good faith on a prosecutor's legal opinion that [an] arrest is warranted under the law is presumptively entitled to qualified immunity from Fourth Amendment claims premised on a lack of probable cause." *Kelly v. Borough of Carlisle*, 622 F.3d 248, 255–56 (3d Cir 2010). In *Kelly*, the Third Circuit explained "[t]hat reliance [on a legal opinion] must itself be objectively reasonable, however, because 'a wave of the prosecutor's wand cannot magically transform an unreasonable probable cause determination into a reasonable one.'" *Id.* at 256. Additionally, "a plaintiff may rebut this presumption by showing that, under all the factual and legal circumstances surrounding the arrest, a reasonable officer would not have relied on the prosecutor's advice." *Id.* The court finds that this case provides a framework for deciding whether Dr. Krause's reliance on the report was reasonable. Accordingly, the court will look to the facts and circumstances surrounding Dr. Krause's decision to terminate Dr. Krug's employment and whether it would be clear to a reasonable official in Dr. Krause's position that he could not terminate Dr. Krug's employment without violating Dr. Krug's First or Fourteenth Amendment rights. *See Springer v. Henry*, 435 F.3d 268, 280 (3d Cir. 2006).

Taking the facts in the light most favorable to the plaintiff, a reasonable official in Dr. Krause's situation should have known that terminating Dr. Krug's employment in these circumstances would violate Dr. Krug's First and Fourteenth Amendment rights. There was evidence presented that Dr. Krause and Ms. Williamson drafted Dr. Krug's termination letter and statement to the constituencies prior to his PDC. And there was testimony from Mr. Lehman that this is not a common or accepted practice within PASSHE. (Plaintiff's Exhs. 76–78; Doc. 199, p. 19–23.) Regarding whether reliance on the Ballard Spahr report was appropriate, there is evidence there was no opportunity for Dr. Krug to make his objections to the Ballard Spahr report prior to the PDC and that Dr. Krug made known during the PDC that many of the allegations in the Ballard Spahr report were false or inaccurate. (Doc. 198, p. 28; Pl's Exh 65.) There was also testimony that Dr. Krug made Dr. Krause aware that Dr. Krug believed Dr. Krause was biased. (Doc. 198, p. 28.) These facts, with all inferences taken in favor of Dr. Krug as the verdict winner, support a finding that it was not reasonable to determine the outcome of the hearing prior to the hearing, rely on a report with noted inaccuracies, and terminate Dr. Krug's employment due to him speaking on

a matter of public concern.[7]  Accordingly, Defendant Krause was not entitled to

qualified immunity and thus, is not entitled to judgment as a matter of law.

### 4.  Personal Involvement of PASSHE

Defendants argue there is no evidence showing involvement of PASSHE in

retaliatory conduct because: (1) it retained an outside law firm to conduct an

investigation; (2) it provided legal and labor relations advice to Bloomsburg

University and its personnel; (3) Dr. Krause made the decision to terminate

Plaintiff; and (4) there was no evidence presented to show PASSHE or its

personnel or representative were involved in unlawful retaliation against Plaintiff.

(Doc. 205, p. 24.)

Dr. Krug points to the following evidence to support PASSHE's

involvement in the termination of his employment.  First, he points to the

testimony from Dr. Krause and Suzanne Williamson, employed by PASSHE at the

time of the events in question, regarding drafting a termination letter prior to Dr.

Krug's PDC.  (Doc. 206, p. 9, 10.)  Plaintiff notes that the jury was free to

disregard Krause and Williamson's explanations of why they drafted this letter

prior to the termination of Dr. Krug's employment if they found them

---

[7] In its memorandum on summary judgment, this court previously held that "Dr. Krug's speech relating to allegations of sexual harassment against a university's president are a matter of public concern."  (Doc. 113, p. 25.)  Specifically, the court held that "it is clear that Dr. Krug's speech in this case can fairly be considered as relating to a matter of concern to the community and discloses a public official's misfeasance."  (*Id.*)(citing *Azzaro v. Cnty. of Allegheny*, 110 F.3d 968, 978 (3d Cir. 1997)).

unbelievable. (*Id.* at 10.) Second, he points to Krause's testimony that he was the "arbiter" of Dr. Krug's discipline but that he worked in collaboration with PASSHE. (*Id.* at 10.) Third, Dr. Krug points to emails between Krause and Williamson drafting the message to the University's key constituencies, which were drafted prior to Dr. Krug's PDC. (*Id.*) Fourth, he points to the aligned dates of the termination of Dr. Krug's employment and the decision of Dr. Hanna's discipline. (*Id.* at 11.) Fifth, he points to the fact that PASSHE retained Ballard Spahr to investigate Dr. Krug's alleged disclosures. (*Id.*) Sixth, Dr. Krug notes that Ballard Spahr, an agent of PASSHE, communicated with Dr. Krause prior to the PDC. (*Id.*) Seventh, Dr. Krug relies upon Defendants' decision not to present any attorneys from Ballard Spahr or the witnesses that Ballard Spahr interviewed at trial. (*Id.*) Eighth, he points to the Ballard Spahr report containing falsehoods and misrepresenting witness testimony. (*Id.* at 12.) Ninth, Dr. Krug relies upon the correspondence between Dr. Krug and Mr. Lehman in which Dr. Krug voiced his complaints about the process he received, and Mr. Lehman's reply that PASSHE had no authority to interfere with the president's decision of who should handle Dr. Krug's matter. (*Id.*) Tenth, Dr. Krug points to the fact that PASSHE employee Lisa Sanno actually participated in the PDC. (*Id.*) And finally, Dr. Krug relies upon Dr. Hanna's testimony at trial that PASSHE handled both Dr. Hanna's PDC and Dr. Krug's PDC. (Doc. 200, p. 85.)

As Plaintiff has laid out, there is ample evidence showing that PASSHE was personally involved in the termination of Dr. Krug's employment.  Accordingly, the renewed motion for judgment as a matter of law is denied on this ground.

## B. Motion for New Trial

### 1. 404(b) Evidence Against Dr. Hanna

Defendants argue that evidence regarding allegations against Dr. Hanna at two prior universities was improperly admitted character evidence under 404(b), because it confused the issue of retaliation in this case with whether Dr. Hanna should have been hired or whether PASSHE supported him.  (Doc. 205, p. 26.) Defendants specifically challenge the admission of an anonymous email and two questions posed by plaintiff's counsel on cross-examination, which were not objected to at trial.  (*Id.* at 27.)  Defendants argue that defense counsel "had no choice but to address these allegations to clarify the record[.]"  (*Id.* at 28.) Defendants argue "[t]hese unsubstantiated claims were wholly irrelevant to the retaliation claim.  They served no legitimate purpose, were highly prejudicial, and clearly influenced the jury's opinion of Dr. Hanna, as reflected in the punitive damages awarded against him."  (*Id.*)

Dr. Krug responds that there was no objection at trial to questioning or documents about Dr. Hanna's time at Kutztown University, and accordingly, that this argument is waived.  (Doc. 206, pp. 28, 29.)  Turning to the anonymous email

regarding Dr. Hanna's time at Delaware Valley University, Dr. Krug notes that the email was admitted for the limited purpose of showing that "Bloomsburg University and PASSHE knew about DVU's faculty's concerns about how Hanna treated women but decided to hire him anyway[,]" and this purpose was proper. (*Id.* at 30.) Dr. Krug concludes that a full cross-examination of Dr. Hanna was proper because the Defendants opened the door to evidence regarding whether Dr. Hanna was "a sexual harasser/discriminator[.] Or [whether] Hanna [was] merely someone who viewed Ms. Crossley–as Hanna testified and as his counsel represented in her opening statement–as like his sister. Defendants cannot open a door and then object to evidence they put at issue." (*Id.* at 31.)

A new trial will not be granted because of the evidence, both through questions and documents, of Dr. Hanna's time at Kutztown University because Defendants failed to object to the admission of the evidence at the time of trial. *Fleck v. KDI Sylvan Pools, Inc.*, 981 F.2d 107, 116 (3d Cir. 1992). There is an exception to this waiver rule: an issue may be reviewed despite a failure to object when "exceptional circumstances" including "the public interest requires that the new issue be heard on appeal or when manifest injustice would result from the failure to consider the new issue, or where it is apparent that counsel failed to object to a fundamental and highly prejudicial error resulting in a miscarriage of justice." *Id.* However, Defendants do not argue any of these exceptional

circumstances, nor do they address their failure to object to any questioning regarding Dr. Hanna's time at Kutztown on a 404(b) basis. (Doc. 206, pp. 30, 31.) Accordingly, the court will not grant a new trial due to the admission of this evidence.

In any event, the evidence was admissible for the permissible 404(b) purpose of showing Bloomsburg and PASSHE's knowledge of certain allegations against Dr. Hanna when they hired him. Bloomsburg and PASSHE's knowledge was relevant to the causation element of the retaliation claims against the two entities because this information was helpful to the jury in considering the two competing theories of the case presented by the parties. Dr. Krug's theory was that PASSHE and Bloomsburg terminated his employment in order to protect Dr. Hanna from further allegations of inappropriate conduct toward women. The Defendants' theory was that Dr. Krug's employment was terminated because he breached confidentiality rules. Thus, the jury could consider the fact that PASSHE had awareness of allegations about Dr. Hanna's conduct towards women at other institutions, and PASSHE then participated in the termination of Dr. Krug for reporting about Dr. Hanna's behavior toward a specific woman. Although the substance of these allegations may be damaging to Dr. Hanna, the prejudice does not substantially outweigh the relevance of this category of evidence.

Defendants did object to the introduction of the anonymous email regarding Dr. Hanna's time at Delaware Valley University on the basis that it could not be authenticated by Dr. Hanna.  (Doc. 197, p. 64.)  In the course of discussion, Dr. Krug's counsel advised the court he was seeking to admit the email "to show that PASSHE, which hired him [Dr. Hanna], knew all these things[.]"  (*Id.* at 68.)  Defendants' counsel responded that that purpose was irrelevant to a retaliation claim or a due process claim.  (*Id.*)  Ultimately, the court overruled the objection regarding the authenticity[8] of the document and admitted the email "for the limited purpose of shedding light on information received by Bloomsburg University and PASSHE in the form of an anonymous email prior to hiring Dr. Hanna as president of Bloomsburg University.  However, this exhibit is not admitted to prove the truth of the statements set forth in the anonymous email."  (*Id.* at 75, 76.)

Again, this email was admitted for the limited purpose of showing Bloomsburg and PASSHE's knowledge when they hired Dr. Hanna.  This is a proper Rule 404(b) purpose, and this evidence was relevant to Bloomsburg and PASSHE's decision making processes and motivations.  This evidence was not admitted for the purpose of showing the propensity of Dr. Hanna to behave in a certain way.  Additionally, the evidence was admitted with a limiting instruction, as requested by counsel.

---

[8] The reasons for overruling this objection are discussed *infra*.

While not favorable to Dr. Hanna, the prejudice associated with admitting this document for a limited purpose does not outweigh the relevance of the document. As the Third Circuit has opined, "[p]rejudice does not simply mean damage to the opponent's cause[,]" but rather, the law guards against unfair prejudice, which is "prejudice of the sort which cloud[s] impartial scrutiny and reasoned evaluation of the facts, which inhibit[s] neutral application of principles of law to the facts as found." *Goodman v. Pa. Turnpike Comm'n*, 293 F.3d 655, 670 (3d Cir. 2002). This evidence was relevant and admitted with a limiting instruction in order to direct the jury's consideration of it and mitigate prejudice towards Dr. Hanna. Accordingly, the motion for new trial will be denied on this ground.

### 2. Anonymous Email

Defendants argue that an anonymous email identifying allegations of Dr. Hanna's previous mistreatment of women was improperly admitted under Rule 901(a) because "[a]nonymous emails cannot be authenticated if an individual cannot establish who wrote, delivered, or received the e-mail." (Doc. 205, pp. 28–30.) (citing *Martsolf v. United Airlines, Inc.,* No. CV 13-1581, 2015 WL 8207435, at *1 (W.D. Pa. Dec. 7, 2015); *United States v. Browne*, 834 F.3d 403, 410 (3d Cir. 2016); *United States v. Vayner*, 769 F.3d 125, 132 (2d Cir. 2014); *United States v. Southard*, 700 F.2d 1, 23 (1st Cir. 1983)). Defendants argue that it was not

established who sent the email, and therefore it was not properly authenticated as what it purports to be. (*Id.* at 30.) Defendants further argue that "the contents of the email were inflammatory, and irrelevant to a retaliation and due process claim. As a result, Defendants should be granted a new trial, as this evidence was both inadmissible and was prejudicial beyond repair." (*Id.*)

Dr. Krug responds that the email was properly authenticated as what it purports to be: "the email sent to Bloomsburg University and PASSHE, and widely circulated, prior to the hiring of Hanna as president." (Doc. 206, p. 32.) Dr. Krug distinguishes the cases cited by Defendants because the proponents of the emails in those cases were trying to prove they were emails from certain individuals. (*Id.* at 34, 35.)

Federal Rule of Evidence 901(a) provides: "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). The burden of authenticating a document is slight and requires "evidence sufficient to support a finding that the item is what the proponent claims it is." *United States v. Turner*, 718 F.3d 226, 232 (3d Cir. 2013.) (quoting Fed. R. Evid. 901(a)). The proponent must only make a *prima facie* case of authenticity and, ultimately, the jury determines the authenticity of the evidence. *Id.* A proponent may authenticate a document in a variety of ways, including

44

testimony of a witness with knowledge that "an item is what it is claimed to be."

Fed. R. Evid. 901(b)(1).

At trial, Plaintiff's counsel laid a foundation through Dr. Hanna's testimony that the anonymous email was an "email [that] went from Delaware Valley University to people at Bloomsburg after I [Dr. Hanna] had interviewed for the position of president at Bloomsburg[,]" and that Dr. Hanna became aware of the email during the application process for the presidency of Bloomsburg through the headhunter who was recruiting him. (Doc. 197, pp. 62, 63.) Dr. Hanna testified he had seen the aforementioned email and identified Plaintiff's Exhibit 192 as the email in question. (*Id.* at 63.) Ultimately, after a question by the court at sidebar, Defendant's counsel admitted that this was the email received by Bloomsburg and PASSHE and was the same email that Dr. Hanna had discussed with the headhunter. (*Id.* at 69.) Therefore, Plaintiff laid a proper foundation for the email pursuant to Rule 901.

The cases cited by Defendants are materially different. In *Marstolf v. United Airlines, Inc.*, No. 13-1581, 2015 WL 8207435, at * 2 (W.D. Pa. Dec. 7, 2015), the court determined that the plaintiff had not produced competent evidence to authenticate the emails as emanating from a certain person because plaintiff had produced no evidence showing the emails were from that person, when the emails had blacked out recipient's address, subject line, and line showing date the e-mails

were sent. *Id.* Here, Dr. Krug never claimed that the email emanated from a certain person and counsel admitted that this was the email that was sent to Bloomsburg and PASSHE during Dr. Hanna's hiring process.

In *United States v. Browne*, 834 F.3d 403 (3d Cir. 2016), the proponent of anonymous Facebook messages attempted to show the messages were sent by the defendant and were authentic under Rule 901(a). The Third Circuit noted that "the relevance of the Facebook records hinges on the fact of authorship. To authenticate the messages, the Government was therefore required to introduce enough evidence such that the jury could reasonably find, by a preponderance of the evidence, that [defendant] and the victims authored the Facebook messages at issue." *Id.* at 410. The case at bar is different because the relevance of the email does not hinge on the authorship of the email. The relevance of the email was related to Bloomsburg and PASSHE having received it. Defendants admitted that they had received it. (Doc. 197, p. 69.) Thus, the email was properly authenticated based on the purpose for which the evidence was introduced.

In *United States v. Vayner*, 769 F.3d 125, 131–32 (2d Cir. 2014), the Second Circuit held that the Government had failed to authenticate a web page as authored by defendant. *Id.* ("[t]he government did not provide a sufficient basis on which to conclude that the proffered printout was what the government claimed it to be–*Zhyltsou's* [defendant's] profile page[.]") (emphasis in original.) Here, there was

no contention that this email was authored by a specific person and thus, needed to be authenticated as such. The email was offered as an anonymous email sent to PASSHE during Dr. Hanna's hiring process, and counsel conceded that this was such email.

In conclusion, the anonymous email was not being introduced as sent from a specific person, and thus, was properly authenticated as the anonymous email received by PASSHE and Bloomsburg during Dr. Hanna's hiring process. Therefore, the motion for a new trial will be denied on this basis.

### 3. Motion *in limine* Regarding Nature of Complaint against Dr. Hanna

Defendants argue that allowing the jury to know that the underlying protected activity involved sexual harassment was prejudicial to Dr. Hanna and such information was irrelevant because Defendants did not dispute that Plaintiff engaged in protected activity. (Doc. 205, p. 33.) Defendants argue "the nature of the protected activity had no bearing on the case and should have been excluded, particularly when categorizing it as 'sexual harassment' of an unclear sort is outrageously prejudicial and effectively encourages the jury to speculate the worst." (*Id.* at 33.)

Dr. Krug responds that the court's clarified ruling on the motion *in limine*— allowing Plaintiff to mention that the allegations against Dr. Hanna were regarding sexual harassment but not get into the details of what was alleged—was a

commonsense solution and consistent with applicable law which would allow Plaintiff to meet the *prima facie* elements of his case, but not prejudice defendant Hanna. (Doc. 206, pp. 41–43.) Dr. Krug then notes that the error lies in defense counsel abandoning the motion *in limine* ruling and opening the door to the underlying facts. (*Id.* at 44.)

In reply, Defendants argue that they conceded Plaintiff had engaged in protected activity, at least regarding the Title VII, IX, and PHRA claims, and that "modification of the motion *in limine* ruling to allow testimony about sexual harassment resulted in unfair prejudice to defendants and warrants a new trial." (Doc. 208, pp. 7, 8.)

Initially, it appears Defendants are challenging this court's modified motion in limine ruling allowing the fact that the misconduct allegations were about sexual harassment but prohibiting any evidence of the underlying substance of those allegations. However, Defendants did not follow this ruling at trial. They chose to open the door and allow the substance of the allegations against Dr. Hanna into the trial after fair warning from the court during the defense opening statement. The jury heard the substance of the allegations at trial because of defense counsel's strategic decision to make it an issue. To the extent that Defendants argue that the jury knowing that the misconduct alleged was sexual harassment, Defendants have

advanced no different arguments than already presented to the court and the court sees no reason to reconsider its prior rulings at this stage.

Additionally, regarding the argument that Defendants had agreed that Dr. Krug engaged in protected activity, the court notes that a stipulation regarding whether plaintiff had met the element of "engage in protected activity" for the Title VII, IX, and PHRA claims was not presented throughout this trial. Accordingly, the court instructed the jury on each element of those claims. In the brief in support of their motion in limine, Defendants vaguely asserted they would concede "for the retaliation claim" that Defendant engaged in protected activity. Considering there were four retaliation claims in this lawsuit, which were based on different events, this statement is not clear enough to qualify as Defendants conceding an element of Plaintiff's claims such that Plaintiff would not need to establish that element at trial for each claim.

Moreover, Defendants do not adequately explain how allowing the jury to hear the general nature of the underlying allegations is unduly prejudicial to Dr. Hanna. As explained above, "[p]rejudice does not simply mean damage to the opponent's cause[,]" but rather, the law guards against unfair prejudice, that is, "prejudice of the sort which cloud[s] impartial scrutiny and reasoned evaluation of the facts, which inibit[s] neutral application of principles of law to the facts as found." *Goodman*, 293 F.3d at 670. Certainly, hearing that Dr. Hanna had been

49

accused of sexual harassment is 'damaging' to the jury's perception of him. However, the court does not believe that simply learning the allegations against Dr. Hanna involved sexual harassment would render the jury unable to impartially evaluate the events, or that any prejudice from this fact was substantially outweighed by the probative value of Plaintiff being able to establish an element of his case. Defense counsel could have minimized prejudice, as Plaintiff's counsel initially did, through argument and testimony. Rather, defense counsel decided to open the door to a full description of Dr. Hanna's conduct with Ms. Crossley. Accordingly, the motion for a new trial will be denied on this basis.

### 4. Exclusion of Ballard Spahr Report for Failure to Qualify as a Business Record

Defendants argue they are entitled to a new trial because the court failed to admit the Ballard Spahr report as a business record. (Doc. 205, p. 34.) Defendants argue the court's ruling was erroneous based on the court's reasoning that the designated keeper of the records was not in the role at the time and that the report was prepared for the purpose of litigation. (*Id.*) Defendants cite to *Conoco Inc. v. Dep't of Energy*, 99 F.3d 397, 391 (Fed. Cir. 1996) to argue that the qualifying witness does not need to be the person who prepared or maintained the record, "as long as the witness understands the system used to prepare the records." (*Id.* at 35.) Defendants also argue the report was not prepared in anticipation of litigation

because "[a]n investigation report into the disclosure of confidential information is not inherently prepared in anticipation of litigation." (*Id.* at 36.)

Defendants further argue that the failure to admit the report was not harmless, even though the report was eventually admitted for the limited purpose of showing its effect on Dr. Krause, due to Plaintiff's counsel's "capitalization" on the court's ruling. (Doc. 205, p. 37.) For example, Defendants argue that counsel's comments as to the report being "such garbage that it's not even admissible for [the jury] to consider what's in it is true[,]" and counsel's side comment that the report has not been admitted show that it was error for the court not to admit the report. (*Id.*) Although it is clear that Defendants' counsel did not appreciate Dr. Krug's counsel's comments, it is not clear why counsel's arguments in closing or comments on whether evidence has yet to be admitted warrant a new trial or show prejudice against Defendants.

With respect to the substance of this argument, Dr. Krug counters by explaining how the Ballard Spahr report fails to meet each foundational requirement of Rule 803(6). (Doc. 206, pp. 36–38.) Dr. Krug also points to the rationale for Rule 803, which is that the regular processes of a business provide assurance of reliability. (*Id.* at 38.) Additionally, Dr. Krug distinguishes each case Defendants relied upon. (*Id.* at 39.) Finally, Dr. Krug argues that "the point of the jury not being able to consider the truth of the Ballard Spahr report was because it

constituted hearsay (defendants chose not to call the report's authors as witnesses), and it also contained multiple levels of hearsay of various persons who defendants chose not to call as witnesses." (*Id.* at 40.)

In reply, Defendants, for the first time, attempt to show they have met the foundational requirements of Rule 803(6). (Doc. 208, pp. 9, 10.) Defendants argue that the Ballard Spahr attorneys who drafted this report had personal knowledge because they conducted the interviews; reiterate that the keeper of the records testified "external documents are routinely kept in the normal course of business, and that an investigation of this nature is routine[;]" Defendants contest that Plaintiff's argument that hiring Ballard Spahr was not a regular practice of PASSHE, and finally, Defendants argues that Plaintiff "ask[s] the Court to take him at his word[]" that the interviews in the Ballard Spahr report are "pure fiction[,]" despite Plaintiff accurately citing to the record wherein he presented evidence from Ms. Rostucher and Jeffrey Krug that what was contained in the report was not accurate to what they told interviewers. (*Id.* at 9, 10; Doc. 206, p. 40.)

Federal Rule of Evidence 803(6) provides:

A record of act, event, condition, opinion, or diagnosis if:

(A) the record was made at or near the time by–or from information transmitted by–someone with knowledge;

(B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

(C) making the record was a regular practice of that activity;

(D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

(E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

FED. R. EVID. 803(6).

The Third Circuit has explained that, in order to admit a document containing hearsay under this exception, the custodian or other qualified witness must testify that:

(1) the declarant in the records had personal knowledge to make accurate statements; (2) the declarant recorded the statements contemporaneously with the actions that were the subject of the reports; (3) the declarant made the record in the regular course of the business activity; and (4) such records were regularly kept by the business.

*United States v. Pelullo*, 964 F.2d 193, 200 (3d Cir. 1992).

At trial, the court provided multiple reasons for not admitting the report. Primarily, the court concluded that the Defendants failed to present testimony that satisfied the foundational elements. As a preliminary matter, the court found that Ms. Williamson was not a proper custodian because she was not employed by Bloomsburg University at the time the record was made, so she could not have

personal knowledge of the foundational requirements at the time the document was prepared. (Doc. 198, p. 129.) On the merits of the exception, the court found that Defendants had not satisfied the foundational elements required of Rule 803(6) because the preparers of the document (Ballard Spahr attorneys) did not have personal knowledge of the matters related in the report, and additionally, it was not a regular practice of Bloomsburg University to have outside law firms prepare investigative reports. (*Id.*) Rather, Ms. Williamson simply testified that it was common for Bloomsburg to maintain documents prepared by outside parties. (*Id.*)

As a separate, independent reason for not admitting the document as a business record, the court noted that this document was prepared for the purpose of investigation and litigation of an employee personnel issue, and, pursuant to *Palmer v. Hoffman*, 318 U.S. 109 (1943), it was within the court's discretion to exclude the document. (*Id.* at 130.) The court also noted that the testimony so far in the case had raised serious question regarding the reliability of information in the report. (*Id.*) Further, the court also expressed hesitation over the layers of hearsay contained with the document. Thus, while the document could potentially be admissible, if an adequate foundation had been laid, each statement would have had to satisfy its own hearsay exception. (*Id.*)

The court stands by this reasoning and does not find Defendants' present arguments to have merit. First, addressing whether Ms. Williamson was the proper

custodian, Defendants argue a proper records custodian need only "understand[]
the system used to prepare the records." (Doc. 205, p. 35) (quoting *Conoco Inc. v.
Dep't of Energy*, 99 F.3d 397, 391 (Fed. Cir. 1996)). Ms. Williamson did not
testify to this effect. She testified regarding the University's process of hiring a
third party to conduct a report, but she did not testify about having any knowledge
as to how this specific report was prepared nor did she testify as to the University's
process for maintaining reports, just that the University maintains outside third
party reports. (Doc. 198, p. 117–126.) This is insufficient to qualify her as a
records custodian. However, even if Ms. Williamson was a proper custodian, her
testimony did not present the foundational requirements in any event because she
was not employed by the University when the record was created or received by
the University. *Pelullo*, 964 F.3d at 201. In substance, Ms. Williamson basically
testified that this report was saved in a file by the University during her
employment with the University (which was later than when the document was
created and received).

Second, Defendants contend that the Ballard Spahr report was not prepared
in anticipation of litigation. (Doc. 205, p. 36.) Even if the court were to agree with
this argument, it would not rectify the fact that Defendants did not lay the
foundational requirements, as explained above. Finally, in Defendants' reply brief,
Defendants attempt–for the first time–to address the foundational requirements of

Rule 803(6).  (*See* Doc. 198, p. 127; Doc. 208, pp. 9, 10.)  This explanation does not change the testimony presented at trial, which did not establish the foundational requirements of Rule 803(6).

Finally, Defendants argue it was error for the court to admit the report with a limiting instruction because it undermined the report's evidentiary value, which was underscored by Plaintiff's counsel using the court's instruction to argue the report was "garbage."   The court notes that there was no objection to the comment at the time and thus, any objection to the comment has been waived.  Accordingly, the motion for a new trial is denied on this basis as well.

CONCLUSION

For the foregoing reasons, Defendants' motion for judgment as a matter of law is denied.  Defendants' motion for a new trial is also denied.  An Order follows.

s/Jennifer P. Wilson<br>JENNIFER P. WILSON<br>United States District Judge<br>Middle District of Pennsylvania

Dated: March 11, 2025